Archie L. MASON and Margaret R. Mason, Administrators of the Estate of Rose Mason, Osage Allottee #327, a Deceased Restricted Osage Indian

v.

The UNITED STATES.

The UNITED STATES

v.

STATE OF OKLAHOMA, Third Party Defendant.

No. 417–70.

United States Court of Claims.

June 16, 1972.

Charles A. Hobbs, Washington, D. C., for plaintiffs. Pierre J. LaForce, Wilkinson, Cragun & Barker, Washington, D. C., and Files, Mahan & Wilson, Pawhuska, Okl., of counsel.

David W. Miller, Washington, D. C., with whom was Asst. Atty. Gen., Kent Frizzell, for defendant.

Paul C. Duncan, Asst. Atty. Gen., State of Okl., for third-party defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS and KUNZIG, Judges.

## ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This case presents the sensitive problem of whether we should continue to follow a ruling of the Supreme Court which is said no longer to be good law. The decision is West v. Oklahoma Tax Comm'n, 334 U.S. 717, 68 S.Ct. 1223, 92 L.Ed. 1676 (1948), upholding the right of Oklahoma to levy its estate tax on certain trust property of restricted Osage Indians. Officials of the Bureau of Indian Affairs paid the tax on behalf of, and out of the estate of, a restricted Osage, and her administrators now claim that in doing so the Federal Government breached its fiduciary obligation and is therefore liable for the amount of the tax. The United States has impleaded Oklahoma and, if ruled responsible, seeks judgment over. We hold for plaintiffs against the Federal Government, and for the latter against the state.

Better to explain why we consider the two governments liable, we shall follow a somewhat winding path to the end: first, setting out the general nature of the property involved (Part I, *infra*); then, the particular facts of the case (Part II); third, disposing of defendant's preliminary objections to reaching the merits (Part III); next, setting forth the history of the taxation, both federal and state, of Osage restricted property (Part IV); fifth, discussing the Government's fiduciary obligation with respect to payment of the Oklahoma estate tax (Part V); then, the present status of the *West* decision, *supra* (Part VI); and, finally, the liability of Oklahoma (Part VII). The first four sections will be the necessary ramble through the lower reaches of the mountain while the last three will be the stiffer climb to the peak.

### I.

#### *Osage restricted property*

The General Allotment Act of 1887, 25 U.S.C. § 331, empowered the President to allot reservation land to the Indians covered by the statute; the allotment was to remain in trust until the Indian was declared capable of managing it, when it would be turned over "free of all charge or incumbrance whatsoever." The Osages were omitted from this 1887 statute but were finally given their own allotments by the Osage Allotment Act of 1906, 34 Stat. 539 (often amended).

Previously, "the Osage reservation was held by the United States in trust for the Osage tribe. By the [1906] act, the tribal lands and funds were equally divided among the 2,229 tribal members. The lands were surveyed and allotted directly to individuals and the minerals were evenly divided through the provision for 'headrights', which is the term used to describe a right to ½₂₂₉th share of the distributable income from the minerals, plus a reversionary title to a like share of the minerals whenever the mineral trust terminates. The act provided that the royalties derived from the extraction of the minerals be placed in the United States Treasury and held in trust for a period of 25 years to the credit of the individual members of the tribe, subject to periodic distributions. By statutory amendment the trust period has been extended to 1983 (52 Stat. 1034, section 3). While the trust exists, legal title to the minerals is in the United States as trustee, but thereafter the minerals will vest absolutely in the allottees or their heirs. See section 2(7) and section 5 of the act, *supra*. These basic arrangements have not been changed in any of the 12 amendments to the act between 1906 and 1957." Big Eagle v. United States, 300 F.2d 765, 766, 156 Ct.Cl. 665, 667–668 (1962) (footnote omitted). See, also, West v. Oklahoma Tax Comm'n, *supra*, 334 U.S. 717, 719–723, 68 S.Ct. 1223 (1948).

Tribal funds from the sale of tribal lands in Kansas were also divided equally by the 1906 act, which set up a Segregated Trust Fund for the 2,229 allottees in the sum of $3,819.76 each. Interest at 5% is to be paid until the trust ends in 1984, and the fund may be invaded by a non-competent Osage only with the approval of the Secretary of the Interior.[1]

The 1906 statute likewise provided for issuance by the Secretary of certificates of competency to an adult Osage who was "fully competent and capable of transacting his or her own business and caring for his or her own individual affairs."

## II.

### *This case*

Rose Mason was an Osage living in Oklahoma who never received a competency certificate. For that reason the United States held in trust certain of her property, including headrights (described in Part I, *supra*), securities held in trust (derived from headrights), cash held in trust (derived from the trust fund described in Part I, *supra*), unpaid headrights payments (income from headrights), and surplus trust funds (derived from headrights).

On her death intestate, representatives of the Federal Government in the Osage Agency, under the usual practice, prepared, signed, and filed an Oklahoma estate tax return for her, including as part of the corpus of the estate the above items of trust property. In September 1967 and December 1968, the Osage Agency paid to the Oklahoma Tax Commission a total of $8,087.10 for state death taxes relating to the decedent. This payment was made out of trust

---

1. The *West* opinion, *supra*, summarizes the status of all these trust properties (334 U.S. at 723, 68 S.Ct. at 1226): "Legal title to the mineral interests, the funds and the securities constituting the corpus of the trust estate is in the United States as trustee. The United States received legal title to the mineral interests in 1883, when it took what is now Osage County from the Cherokees in trust for the Osages; and that title has not subsequently been transferred. Legal title to the various funds and securities adhered to the United States as the pertinent trusts were established and developed. Beneficial title to these properties was vested in the decedent and is now held by his sole heir the appellant. The beneficiary at all times has been entitled to at least a limited amount of interest and royalties arising out of the corpus. And the beneficiary has a reversionary interest in the corpus, an interest that will materialize only when the legal title passes from the United States at the end of the trust period. But until that period ends, the beneficiary has no control over the corpus."

funds of decedent held by the Government.

Plaintiffs are administrators of the estate of Rose Mason, appointed by the County Court of Osage County, Oklahoma.[2] They had nothing to do with the filing of the estate tax return, or the payment of the state taxes. They were discharged in May 1968, but in November 1970 the District Court of Osage County reopened the estate and reappointed plaintiffs "for the purpose of instituting such suit as may be proper to recover the estate taxes erroneously paid, together with interest thereon."

The result was the petition here, filed on November 20, 1970, alleging that the Federal Government breached its fiduciary duty in paying the Oklahoma estate tax on the trust properties described above. The United States impleaded the State of Oklahoma as third party defendant, asking for judgment against the state "equal to such judgment, if any, as may be entered on behalf of the plaintiffs against the United States."

Both the Federal Government and the plaintiffs have moved for summary judgment. The motion of the United States asks that, if plaintiffs prevail, there be recovery over against the state. Oklahoma has not moved for judgment, but it appeared and argued orally that the challenged tax was properly imposed on the trust property under West v. Oklahoma Tax Comm'n, *supra*.

### III.

*Defendant's preliminary objections*

■ The United States interposes some preliminary reasons for dismissing the petition without reaching or even touching on the merits, but we reject those threshold defenses. One is that the plaintiffs, administrators of the estate, are not the proper parties to sue; Rose Mason's heirs are said to be the real parties in interest and indispensable suitors. The shortest answer is that under Rule 61(a) of our Rules the plaintiffs may sue as duly authorized administrators on behalf of the estate, out of the funds of which the disputed tax was paid before distribution of the estate's assets to the heirs.

■ Another defense is that the claimants failed to exhaust their administrative remedies by omitting to appeal within the Bureau of Indian Affairs, under 25 CFR § 2.3 (1967), from the Osage Agency's payment of the tax.[3] It is unlikely that this § 2.3 intended to cover as a "decision" the action of the Osage Agency in paying the tax; some more formal determination seems to have been contemplated since 25 CFR § 2.2 and 2.4 require such "decisions" to be put in writing and that notice be given to the affected Indian—and neither of these directives was fulfilled here. In any event, the administrative appeal is optional, not mandatory—the regulation says the affected Indian "may" appeal—and under the familiar principle does not preclude a court suit.

■ In its own motion for summary judgment (which was filed first), the defendant sought to reserve, as "factual matters" calling for further trial proceedings, its separate defense that plaintiffs are barred by their failure to object to the payment of the tax.[4] How-

---

2. State courts have probate jurisdiction of Osage estates under the Act of April 18, 1912, 37 Stat. 86.

3. This regulation provides:

   "In accordance with the procedure in this part, any interested party adversely affected by a decision of an official under the supervision of an Area Director of the Bureau of Indian Affairs may appeal to the Area Director; an appeal may be taken to the Commissioner of Indian Affairs from a decision of the Area Director; and an appeal may be taken to the Secretary of the Interior from a decision of the Commissioner."

4. These defenses averred that plaintiffs "are estopped by past conduct from now complaining of" the facts alleged in the petition, and specified the failure to object as well as the ruling of the County Court originally discharging the administrators and declaring that all taxes due and owing by the estate had been paid.

ever, after the plaintiffs filed their motion for summary judgment the Government did not file any affidavits or indicate in any other way that there were further facts to be tried or found. We shall therefore assume that we now have all the facts upon which the defenses of estoppel and laches are based and dispose of them in connection with our discussion of the Government's fiduciary responsibility (Part V, *infra*).

## IV.

### *The course of taxation of Osage restricted property*

To understand our analysis of the obligation of the United States (Part V, *infra*) and of the current status of West v. Oklahoma Tax Comm'n, *supra* (Part VI, *infra*), it will help to begin by setting out, descriptively, the history of the taxation by the United States and the states of Osage (and comparable) Indian restricted property.

A. With regard to that type of asset, as we have indicated the Osage Allotment Act, as amended, places it in trust and goes on to say (as spelled out in the 1947 amendment, 61 Stat. 747):

That the Osage lands and funds and any other property which has heretofore or which may hereafter be held in trust or under supervision of the United States for such Osage Indians not having a certificate of competency shall not be subject to lien, levy, attachment, or forced sale to satisfy any debt or obligation contracted or incurred prior to the issuance of a certificate of competency.

Earlier, the 1912 amendment, 37 Stat. 86, 88 had put it this way: "nor shall the lands or funds of Osage tribal members be subject to any claim against the same arising prior to grant of a certificate of competency. That no lands or moneys inherited from Osage allottees shall be subject to or be taken or sold to secure the payment of any indebtedness incurred by such heir prior to the time such lands and moneys are turned over to such heirs * * *." [5]

In 1929 and 1938, Congress amended the Act (45 Stat. 1478–79, 52 Stat. 1034, 1035) to direct that the restricted mineral lands "and all royalties and bonuses arising therefrom shall belong to the Osage Tribe of Indians and shall be disbursed to members of the Osage Tribe or their heirs or assigns as now provided by law * * *."

B. For many years Indian trust or restricted property was considered immune from state taxation on various theories, the last being that such properties were "federal instrumentalities" and therefore exempt by constitutional implication. See Oklahoma Tax Comm'n v. United States, 319 U.S. 598, 602–604, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943).[6] This reasoning was rejected by the Supreme Court in its *Oklahoma Tax Comm'n* opinion, *supra*, 319 U.S. 598, 603, 63 S. Ct. 1284, which then went on to consider whether immunity flowed from the Congressional restrictions on alienability and use. The case involved inheritance taxes imposed by Oklahoma on the transfer of the estates of members of the Five Civilized Tribes who held legal title to their property; the estates included restricted cash and securities under the supervision of the Secretary of the Interior. The Court held "that the restriction, without more, is not the equivalent of a congressional grant of estate tax immunity for the cash and securities" (319 U.S. at 602, 63 S.Ct. at 1285), finding that "(1) the legislative history of the Act [imposing the restriction] refutes the contention that an exemption was intended; and (2) applica-

---

5. A brief history of the pertinent changes in the Osage Allotment Act is given at Big Eagle v. United States, *supra*, 300 F.2d 765, 768–769, 156 Ct.Cl. 665, 672–673 (1962).

6. At the same time, federal income and federal estate taxes seem to have been levied and collected with respect to much of this property (at least in the later years). See part VI B, *infra*, and notes 8 and 13, *infra*.

tion of the normal rule against tax exemption by statutory implication prevents our reading such an implication into the Act" (319 U.S. at 604, 63 S.Ct. at 1287).

Five years later, this holding was applied to the very type of trust property now before us—Osage headrights (and funds derived therefrom) and shares of the Osage trust fund (derived from the Kansas lands) held in trust by the United States for the Indians. West v. Oklahoma Tax Comm'n, *supra,* 334 U.S. 717, 68 S.Ct. 1223 (1948). The Court "fail-[ed] to see any substantial difference for estate tax purposes between restricted property and trust property. The power of Congress over both types of property is the same * * *. The effect which an estate or inheritance tax may have is the same in both instances; liens may be placed on both restricted and trust properties and lead to complications; and both types of property may of necessity be depleted to assure payment of the tax." 334 U.S. at 726, 68 S.Ct. at 1228. The Court refused to find any reason for immunity in the fact that the estate might "be tapped repeatedly by Oklahoma until 1984 [the end of the trust] by the deaths of the various heirs", and "the result may be a substantial decrease in the amount then available for distribution" 334 U.S. at 726, 727, 68 S.Ct. at 1227. The opinion also pointed out the distinction between estate or inheritance taxation and property taxes. "It is the transfer of these incidents [on death], rather than the trust properties themselves, that is the subject of the inheritance tax in question." 334 U.S. at 727, 68 S.Ct. at 1228. But the Court also noted that "should any of the properties transferred be exempted by Congress from direct taxation they cannot be included in the estate for inheritance tax purposes. No such properties are here involved, however." 334 U.S. at 727–728, 68 S.Ct. at 1228.

C. The *West* opinion is the last word from the Supreme Court directly on point, but it is not the last word on Indian tax immunity. Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956), concerned the right of the Internal Revenue Service to impose the federal income tax (capital gain tax) on sale of standing timber on land of a Quinaielt Indian (in the State of Washington) held in trust for him by the United States under the General Allotment Act. The Court held that the tax could not be levied.[7] First, the opinion looked favorably on the Indian's argument that immunity was implied by the Government's promise (in the General Allotment Act) to transfer fee title to the land (at the end of the trust) "free of all charge or incumbrance whatsoever". But the Court did not place its holding solely on that ground (351 U.S. at 6–7, 76 S.Ct. at 615). It relied more heavily on a provision of the Allotment Act that after award of a patent to the allottee in fee simple "all restrictions as to sale, incumbrance, or taxation of said land shall be removed * * *." This was said to imply that, before transfer, the allotted land was to be free of all taxes. 351 U. S. at 7–9, 76 S.Ct. at 615. The "wisdom of the congressional exemption from tax" was manifested, the Court thought, by the fact that unless the full proceeds of the timber sale were preserved for the Indian allottee he would not have the necessary chance of survival when declared competent and the trust ended. 351 U.S. at 10, 76 S.Ct. at 617.

D. A year after Squire v. Capoeman—a federal income tax case—the Ninth Circuit held, on its authority, that the trust allotment of a California Mission Indian was not subject to state inheritance taxes. Kirkwood v. Arenas, 243 F. 2d 863 (C.A. 9, 1957). Although the Mission Indian Act did not contain the provision (in the General Allotment Act) relating to "taxation" on which

---

7. The prior assumption by the Internal Revenue Service appears to have been

that the tax could be imposed. See Part VI, *infra.*

the Supreme Court had mainly rested, the *Arenas* opinion considered that the two statutes were in *pari materia* and that the *Squire* decision controlled. Alternatively, the court ruled that the declaration in the Mission Act that the fee was to be transferred "free of all charge or incumbrance whatsoever" was sufficient by itself under the *Squire* theory.

In 1962, in Big Eagle v. United States, 300 F.2d 765, 156 Ct.Cl. 665, this court refused, relying on *Squire*, to permit the federal income tax to be applied to income derived from Osage trust properties of the exact type now before us. Like the *Arenas* case, *supra*, we read the Osage Allotment Act in the same spirit, as understood by *Squire*, as the General Allotment Act—even though the former differed in terms from the latter, omitting not only the "taxation" provision but also the "free of any charge or incumbrance" language. 300 F.2d at 770–772, 156 Ct.Cl. at 676–678. Our opinion emphasized, as equivalent to the latter declaration, the amendments to the Osage legislation directing that "*all* royalties and bonuses arising therefrom [the Osage mineral lands] * * * *shall* be disbursed to members of the Osage Tribe or their heirs or assigns as now provided by law * * * *" [emphasis added]; pointed out the similarities and common purpose of the General Allotment and Osage Allotment Acts; and added that Congress could have, but did not, specifically legislate to impose the income tax on income from noncompetent Osage headrights.[8]

In the same year, the Tenth Circuit applied *Squire* to Quapaw Indians (who, like the Osages, had their own allotment act), excepting federal income tax gain from restricted Indian lands. United States v. Hallam, 304 F.2d 620 (C.A. 10, 1962). The next year, Nash v. Wise-

man, 227 F.Supp. 552 (W.D.Okl.1963), extended *Squire* to federal estate taxes on trust property of an Indian subject to the General Allotment Act. To the same effect is Asenap v. United States, 283 F.Supp. 566 (W.D.Okl.1968). See, also, United States v. Daney, 370 F.2d 791 (C.A. 10, 1966) (mineral lease bonus immune from federal income tax although statute provided for taxation of the minerals themselves).

E. In 1969 the Internal Revenue Service ruled (Rev.Rul. 69–164, 1969–1 Cum.Bull. 220) that Indian trust properties held under the General Allotment Act were free of the federal estate tax. This ruling expressly follows *Squire*. By a Technical Advice Memorandum, August 15, 1969, to the District Director of Internal Revenue in Oklahoma City, the Service announced that the principles of Rev.Rul. 69–164, *supra*, were also applicable to Osage restricted-property estates. The memorandum says: "In our analysis of the two allotment acts [General Allotment Act and Osage Allotment Act] and their legislative history we found no indications that Congress intended to treat the Osage Indians any different than any of the tribes covered by the General Allotment Act of 1887. On the contrary, the general tone of both acts, the nature of the responsibilities assumed by the United States, and the similarities and basic concepts (especially the basic concept of conserving the property for the incompetent) indicate a common congressional intent underlying both acts."

F. To summarize the bare bones of the taxable status of restricted Indian property since Squire v. Capoeman in 1956: (1) Such Osage property and its proceeds have been expressly held immune, by court decision or Internal Revenue Service ruling, from the federal income tax and the federal estate tax; (2)

---

8. In 1930, before. *Oklahoma Tax Commission* and *West*, the Tenth Circuit had held such income immune. Blackbird v. Com'r of Internal Revenue, 38 F.2d 976, 977–978. The rationale of this decision was disapproved in Superintendent v. Commissioner of Internal Revenue, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935), but appears to have been revived in Squire v. Capoeman. See Part VI B, *infra*.

restricted property of other Indians subject to the General Allotment Act or comparable legislation has been held immune, in *Squire* or since, from the federal income tax, the federal estate tax, *and state death taxes*; and (3) in rulings involving federal taxes, the Osage Allotment Act has been said by this court and by the Internal Revenue Service to be on all fours with the General Allotment Act with respect to the immunity of restricted trust property from taxation. But since the *West* case in 1948, there has been no holding exactly on the precise issue now before us—the liability of such Osage property to state death taxation.

## V.

### *The Government's obligation as fiduciary*

This is a suit against the United States, not against the Oklahoma taxing authorities, and the United States did not receive the tax money. The burden of the petition, rather, is that the Federal Government breached its fiduciary obligation by paying the Oklahoma estate tax, and is therefore liable under 28 U.S.C. § 1491 (our general jurisdictional statute) for this breach of trust.

■ A. One of the major defenses is that, whether or not *West* is still good law, the Osage Agency acted reasonably, in 1967 and 1968, in relying on it, and accordingly the Government did not violate any trust obligation to Rose Mason's estate or her heirs. We need not decide what the defendant's duty would have been if there had been no hint of the possible fallibility of *West*. For we are satisfied that, by 1967 and 1968 when the tax was handed over, the shadows on that decision loomed so large that the Government, as fiduciary with the obligation to protect the Indians, should have tested the current acceptability of

*West* by challenging collection of the tax.

The history recounted in Part IV, *supra*, shows that by 1967 the Supreme Court had decided *Squire*, the rationale of which is at the least difficult to harmonize with the theory of *Oklahoma Tax Comm'n* and *West*; in *Big Eagle* this court had applied *Squire* to Osage restricted income, and still another court had done the same to an Indian group likewise not under the General Allotment Act; courts had also extended the *Squire* principles to state death and federal estate taxes, in litigation involving both General Allotment Act Indians and other Indians (not Osages) subject to other laws. The General Allotment Act, these other statutes, and the Osage Act had all been said to have the same effect with respect to taxability.

The Internal Revenue Service had not formally applied the *Squire* rationale to federal estate taxes (which it did on April 7, 1969 in Rev.Rul. 69–164, *supra*) but this ruling came so soon that it could and should have triggered a suit by the Government against the state for refund. Moreover, the revenue ruling was foreshadowed by the defendant's settlement of Beartrack v. United States, Ct.Cl. No. 281–67. This was an action in this court for refund of federal estate taxes paid with respect to restricted trust properties of an Osage decedent. The defendant settled by a full refund on October 25, 1968. This was about two months before the Osage Agency made its last payment to Oklahoma with respect to Rose Mason's estate.

From all this, the Department of the Interior would have to conclude, in our view, that there was at the very least a serious question whether *West* remained viable and that, as a fiduciary for Rose Mason and her estate, the United States would have to test that issue by protesting the payment of the tax and litigating its applicability.[9] Faced with the

9. In Oklahoma Tax Comm'n v. United States, *supra*, 319 U.S. 598, 63 S.Ct.

1284, the Federal Government brought the suit to recover the inheritance taxes

developments in the law since *West* in 1948, no trustee could properly decide the matter finally for itself, but would have to remit the question to an appropriate tribunal. See Bogert, Trusts and Trustees (2d ed. 1959), §§ 581 (at 207), 582 (at 216), 594 (at 288), 602 (at 386).

**B.** The Congressional directive in the Osage Allotment Act that the properties with which we are concerned be held by the Federal Government in trust for the noncompetent allottee (see 34 Stat. 539, 543 (§ 3), 544 (§ 4), 544–45 (§ 5); 37 Stat. 86, 88 (§ 7); 61 Stat. 747) necessarily implies that the Bureau of Indian Affairs must act as a trustee, and subject to the general limitation that a trustee must act for the benefit of his *cestui* reasonably, in good faith, and not arbitrarily or in abuse of discretion. The defendant does not deny that the Bureau was under this obligation, and the implication of such a duty is firmly supported by our prior decisions in comparable circumstances. See Menominee Tribe v. United States, 101 Ct.Cl. 10, 19–20 (1944); Menominee Tribe v. United States, 101 Ct.Cl. 22, 40 (1944); Gila River Pima-Maricopa Indian Community v. United States, 140 F. Supp. 776, 780–781, 135 Ct.Cl. 180, 189 (1956); Oneida Tribe v. United States, 165 Ct.Cl. 487, 493–494, cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964); Seneca Nation v. United States, 173 Ct.Cl. 917, 925 (1965); Navajo Tribe v. United States, 364 F.2d 320,

322–323, 176 Ct.Cl. 502, 507–508 (1966); Sac and Fox Tribe v. United States, 383 F.2d 991, 1001, 179 Ct.Cl. 8, 27, cert. denied, 389 U.S. 900, 88 S.Ct. 220, 19 L. Ed.2d 217 (1967); Gila River Pima-Maricopa Indian Community v. United States, 427 F.2d 1194, 1198, 190 Ct.Cl. 790, 797–798, cert. denied, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); cf. Seminole Nation v. United States, 316 U.S. 286, 296–297, 62 S.Ct. 1049, 86 L. Ed. 1480 (1942).[10] In this instance, as we have just indicated, we think that the Bureau did violate this duty by paying the tax without seeking an adjudication whether it was actually owed.

**C.** Defendant argues, however, that responsibility lay on the plaintiffs, as administrators of the estate, to bring suit to recover the tax. Apparently it was possible for plaintiffs to do so (see West v. Oklahoma Tax Comm'n, *supra*, 334 U.S. 717, 68 S.Ct. 1223; Nash v. Wiseman, *supra*, 227 F.Supp. 552 (W.D. Okl., 1963); cf. Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968)), but they point out that they had nothing to do with the filing of the state estate tax return or the payment of the tax, and that the formal assessment of the tax by the Oklahoma Tax Commission was not filed in the County Court (the probate tribunal) until December 1968, and accordingly they did not receive formal notice of the payment until that time—some seven months after their original discharge as administrators.[11]

imposed by Oklahoma. See, also, IV Scott, Trusts (3d ed. 1967), § 280 (at 2327, 2328); Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 369–370, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968).

10. " * * * this Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people. * * * Under a humane and self imposed policy which has found expression in many acts of Congress [footnote omitted] and numerous decisions of this Court, it [the Federal Government] has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards." 316 U.S. at 296–297, 62 S.Ct. at 1054.

11. The County Court was not asked to pass upon the propriety of paying the estate tax; the formal declaration in the final decree that "all taxes" were paid

■ Even if plaintiffs should have surmised that the state's levy had been paid (see note 11, *supra*), we do not believe their only remedy was to file suit against the state in their own behalf. The United States was the trustee, and it had the primary responsibility to act. A *cestui* or ward is not limited to pursuit of a third party where the trustee has paid over money improperly to that third party. The injured *cestui* can bring action against the trustee to rectify the wrong. See IV Scott, Trusts (3d ed. 1967) § 279 A (at 2321).

■ Defendant also raises the specter of estoppel and laches, but neither can be shown here. This suit was begun less than two years after formal notice of the state assessment, and the United States is not precluded by limitations from suit over against the State of Oklahoma (see Part VII, *infra*). The administrators may have failed to protest the payment, but they were under no obligation to do so, especially in the absence of any notification by the Osage Agency that the money was to be handed over to the state. As we have held above (Part III, *supra*), plaintiffs were under no duty to exhaust administrative remedies before filing this action. Similarly, their omission to spur the Bureau of Indian Affairs to refuse to pay, or seek a refund, does not create an estoppel. The defendant was primarily responsible. IV Scott, op.cit., *supra*.

■ D. A suit against the United States on behalf of the estate of a non-competent Indian, for damages compensating the estate for breach by the Government of its trust obligation under a federal statute, is within 28 U.S.C. § 1491 as a claim founded upon an Act of Congress and for damages "in cases not sounding in tort." The Osage Allotment Act implies that, if the Government breaches its trust duty to the pecuniary

disadvantage of a non-competent Osage allottee, due compensation will be paid by the United States. See Ralston Steel Corp. v. United States, 340 F.2d 663, 667–668, 169 Ct.Cl. 119, 125–126 cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965); Eastport S.S. v. United States, 372 F.2d 1002, 1007–1008, 178 Ct.Cl. 599, 605–606 (1967). *Cf.* Seminole Nation v. United States, *supra*, 316 U.S. 286, 297, 300, 307–308, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); Menominee Tribe v. United States, *supra*, 101 Ct.Cl. 10, 20–21 (1944); Menominee Tribe v. United States, *supra*, 101 Ct.Cl. 22, 40–41 (1944); Navajo Tribe v. United States, *supra*, 364 F.2d 320, 322–323, 176 Ct.Cl. 502, 509–510 (1966); Hebah v. United States, 428 F.2d 1334, 192 Ct. Cl. 785 (1970).

E. There remains the problem of the damages for the Government's breach of its obligation to test the applicability of the Oklahoma tax. If the tax was validly imposed, plaintiffs suffered no monetary damage from the defendant's dereliction. On the other hand, if the tax was not owing, plaintiffs suffered more than a nominal wrong and are entitled to an appropriate remedy. Since the pecuniary injury was the amount of the invalid payment from the trust monies, the estate should recover that sum. It is plain to us, therefore, that in order to render a proper judgment in this litigation we must reach and decide the legality of the tax.

## VI.

*The current standing of West v. Oklahoma Tax Commission*

■ Appraisal of the applicability of the tax necessarily thrusts us into an inquiry on the current status of West v. Oklahoma Tax Comm'n, *supra*, 334 U.S. 717, 68 S.Ct. 1223 (1948). For an infe-

does not mean that the Osage Agency presented the estate tax matter to the probate court before payment. Defendant admits that the Osage Agency did not advise plaintiffs or their attorneys of

the payment of the tax, but assumes that the local attorneys, who were knowledgeable in the field, must have known it would be paid.

rior tribunal this is a most delicate undertaking. It goes without saying that we cannot refuse or fail to follow a Supreme Court decision, directly in point, because we disagree with its reasoning or think it erroneous. See, *e. g.,* Mc-Corkle v. The First Pennsylvania Banking & Trust Co., C.A.4, 459 F.2d 243 decided April 20, 1972 (Sobeloff J.) But our responsibility differs where there have been significant developments—in the Supreme Court itself, in the lower courts, and in relevant administrative practice—showing that the underpinnings of the highest court's decision have been seriously weakened or eroded. If that is so, a lower court can properly, without disrespect or flouting authority, make the judgment, in due care and circumspection, that the Court will no longer follow its earlier holding. *See, e. g.,* Barnette v. West Virginia State Board of Ed., 47 F.Supp. 251, 252–253 (S.D. W.Va.1942) (Parker J.), aff'd, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); United States v. Girouard, 149 F.2d 760, 765–767 (C.A. 1, 1945) (Woodbury J., dissenting), rev'd, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946); Andrews v. Louisville & Nashville R.R., 441 F.2d 1222 (C.A. 5, 1971), aff'd, 406 U. S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 decided May 15, 1972.

The history in Part IV, *supra,* shows, in our view, that there has been just such a significant development with respect to *West*—beginning with Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883, in 1956. There has been a marked change in the evaluation of the reasons given by the Court for its result in *West* (and the precursor, Oklahoma Tax Comm'n v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943)), and there has also been a considerable increase in the kinds of taxes with respect to which restricted Indian property has been held immune. In several crucial aspects the essential bases of *West* have been so weakened that, in our opinion, the decision no longer stands as authoritative.

A. Following the lead of Oklahoma Tax Comm'n v. United States, *supra,* the *West* opinion put aside as immaterial the facts that, if the tax was leviable, Oklahoma could impose a lien on the property (334 U.S. at 725, 68 S.Ct. 1223, 92 L.Ed. 1676) and the estate could be much depleted through successive payments of state death taxes before the end of the trust period (334 U.S. at 725–726, 727, 68 S.Ct. 1223, 92 L.Ed. 1676). *Squire* took the opposite positions that (1) provision in an allotment statute that the property was to be transferred, at trust end, free of all charge or incumbrance "might well be sufficient" to bar taxation (351 U.S. at 6–7, 76 S.Ct. 611), and (2) it is necessary to preserve the property wholly intact for the Indian—including immunity from taxation—so that he can "go forward when declared competent with the necessary chance of economic survival in competition with others" (351 U.S. at 10, 76 S.Ct. at 617).

Again, *West* demanded affirmative indications by Congress "that these burdens require that the transfer be immune" from tax liability (334 U.S. at 727, 68 S.Ct. at 1228). See also Oklahoma Tax Comm'n v. United States, 319 U.S. at 604, 606, 607, 609, 63 S.Ct. 1284, *Squire,* reversing the presumption, considered these burdens so important that Congress should affirmatively authorize taxability if the desire was to permit it.

Thus, both of the main foundations for *West* (and *Oklahoma Tax Commission*) were disavowed in Squire v. Capoeman. It is this latter approach which has been uniformly applied in the subsequent lower court cases and administrative rulings referred to in Part IV, *supra.* The *West-Oklahoma Tax Commission* attitude has been silently dropped and its reasoning no longer utilized. As their texts reveal, those two opinions were the yield of a period in which the Supreme Court was intent on doing away with the various forms of intergovernmental tax immunity, and Indian tax exemption had been supported on that theoretical basis. For at

least the last fifteen years, the judicial climate has changed to concentrate, not on the relationship of Indian tax immunity to other exemptions, but on the particular social goals Congress has sought to reach through its restrictions on Indian properties.

B. It seems clear, too, that in deciding *Oklahoma Tax Comm'n* and *West*, the Supreme Court thought (at that time) that restricted Indians were subject to both federal income and estate taxes with respect to restricted and trust property—and that this was an important factor in the decisions. The *Oklahoma Tax Commission* opinion indicates this very plainly. 319 U.S. at 601, 608, 63 S.Ct. 1284, including fn. 12 (relating to the federal estate tax). The Court referred (at 601, 63 S.Ct. at 1285) to Superintendent v. Commissioner, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517, as broadly holding "that the restricted income of Indians was subject to the federal income tax" (see note 8, *supra*), and observed (319 U.S. at 608, 63 S.Ct. at 1288): "Congress cannot have intended to impose federal income and inheritance taxes on the Indians and at the same time exempt them by implication from similar state taxes." [12]

In *West*, the briefs before the Supreme Court show that the Oklahoma Tax Commission (the appellee) stressed that Osage trust properties were then subject to both federal income tax and federal estate tax; as to the latter, the brief included a letter from the Commissioner of Internal Revenue saying that federal estate taxes were being imposed on and collected from estates of restricted Osage Indians. [13] West's brief did not dispute this assertion.

Today the situation is very different. *Squire* distinguished Superintendent v. Commissioner, *supra*—despite its unqualified language—as limited to reinvestment income (351 U.S. at 9, 76 S.Ct. 611), and held direct, initial income of those restricted Indians nontaxable. Income from Osage properties of the kind now at stake has been specifically held not subject to federal income tax. Big Eagle v. United States, *supra*, 300 F.2d 765, 156 Ct.Cl. 665 (1962). And the Internal Revenue Service has ruled that this property is likewise immune from the federal estate tax (see Part IV, *supra*). The demand for equal treatment of state and federal taxes, which seemed to move the Court in *Oklahoma Tax Commission* and *West*, now works the other way—against taxability. [14]

C. Though *Squire* dealt with the General Allotment Act and the Osage statute contains different wording, the developments since *Squire* have shown that no distinction should be made on the basis of the particular language of the various pieces of Indian allotment legislation. The lower courts have applied the *Squire* principles to Indians not covered by the general act (Kirk-

---

12. The brief for the United States, on behalf of the Indians, in *Oklahoma Tax Commission* expressly agreed that the federal estate tax was applicable.

13. The Service limited this determination to estates of Indian decedents dying after June 25, 1940, when it was decided to impose the tax on this type of estate.

The vagaries of federal income taxation of restricted Indian income are recited in the Supplemental Memorandum for the Petitioner, in Squire v. Capoeman, U.S.Sup.Ct., Oct. Term 1955, No. 134. At the time of *West* and *Oklahoma Tax Commission* it appears that the tax was being collected under an opinion of the

Attorney General holding it applicable. See, also, *Squire*, 351 U.S. at 8–9, 76 S.Ct. 611.

14. In Landman v. United States, 58 F. Supp. 836, 103 Ct.Cl. 199, 209–210 (1945), this court indicated that property exempt from state estate taxes was also necessarily exempt from the federal estate tax; and in the decision which led to *West* the Supreme Court of Oklahoma considered that state and federal immunity or lack-of-immunity was correlative. Yarbrough v. Oklahoma Tax Comm'n, 200 Okl. 402, 193 P.2d 1017, 1020–1021 (1947), aff'd, 334 U.S. 841, 68 S.Ct. 1510, 92 L.Ed. 1765 (1948).

wood v. Arenas; Big Eagle v. United States; United States v. Hallam), and the Internal Revenue Service has used them for the Osages (Technical Advice Memo, Aug. 15, 1969). See Parts IV and V A, *supra*. As both this court (in *Big Eagle*) and the Revenue Service have said, the terms of the Osage Allotment Act (see Part IV A, *supra*) are sufficiently close to those of the General Allotment Act to require the same approach and the same reading.[15]

D. Nor can we properly distinguish *Squire* as involving an income tax, not a death levy. *West,* it is true, does differentiate death taxes from property taxes as "imposed upon the shifting of economic benefits and the privilege of transmitting or receiving such benefits" (334 U.S. at 727, 68 S.Ct. at 1228). This dissimilarity seems to have been noted solely in connection with that taxpayer's argument that there was a difference between the Indian-owned-but-restricted property in *Oklahoma Tax Commission* and the United States-owned-trust property in *West*; the Supreme Court uses the incidence of the estate tax to show that the difference from *Oklahoma Tax Commission* was not meaningful in the context of tax immunity.

In any event, the *Squire* rationale, rather than this distinction in *West,* has been carried over to death taxes by the Internal Revenue Service (for federal estate taxes)[16] and by lower courts (for both federal and state death taxes). See Part IV, *supra*. We, too, see no reason for carving out estate and inheritance taxes for separate treatment. The *Squire* principles—especially the warning against diminution of restricted assets through payment of taxes—apply at least equally, perhaps even more, to death levies with their possible successive and cumulative impact before the restriction ends.

E. *Squire* related, of course, to a federal tax, and we are now concerned with a state impost, but that does not make the *Squire* reasoning irrelevant. As we have pointed out, the same factors which influenced the Court to find immunity from the federal income tax in the allotment legislation are present for death taxes, state or federal. The Internal Revenue Service has agreed for the federal estate tax. It is clear that Congress has the power to immunize these restricted properties from state levies.[17] *Cf.* Warren Trading Post Co. v. Arizona State Tax Commission, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). And it would be strange and uncharacteristic for Congress to withhold the federal estate tax (on the ground it could deplete the corpus) but to authorize the comparable state levy.

However, a statement in *Oklahoma Tax Commission* is stressed—"If Congress intended to relieve these Indians from the burden of a state inheritance tax as a consequence of our national policy toward Indians, there is still no reason why we should imply that it intended the burden to be borne so heavily by one state." 319 U.S. at 609, 63 S.Ct. at 1289. That observation was probably made in the belief that federal income

15. In particular, the portions of the Osage Act which forbid trust assets from being "subject to lien, levy, attachment, or forced sale to satisfy any debt or obligation contracted or incurred prior to the issuance of a certificate of competency", and provide that "all royalties and bonuses arising therefrom [the Osage, mineral lands] * * * shall be disbursed to members of the Osage Tribe or their heirs or assigns as now provided by law."

16. Defendant's brief says candidly that "Revenue Ruling 69–164 [see Part IV, *supra*] has the appearance of being contrary to the decision of the Supreme Court in *West.*" There is, however, no suggestion that the ruling is being (or has been) repudiated.

17. No argument is made by the defendant or Oklahoma that Congress is without power to exempt such Indian estates from state taxation.

and estate taxes were collectible (see Part VI B, *supra*), an assumption no longer so. Moreover, Oklahoma does not now appear to be singled out; since *Squire,* other states inhabited by Indians with restricted property are no doubt under the same disability. See Kirkwood v. Arenas, *supra,* 243 F.2d 863 (C. A. 9, 1957) (California inheritance tax).[18]

F. At the end of the *West* opinion, the Court appends the unelaborated remark that *Oklahoma Tax Commission* "makes clear that should any of the properties transferred be exempted by Congress from direct taxation they cannot be included in the estate for inheritance tax purposes. No such properties are here involved, however." 334 U.S. at 727–728, 68 S.Ct. at 1228. When it adopted those sentences, the Court, in all probability, considered the Osage trust properties to be subject to federal income tax (Part VI B, *supra*), and that may have been the reason why it thought no properties exempt from direct taxation were there involved. The income tax is often characterized as a "direct tax"

(that is why the Sixteenth Amendment had to be adopted, *cf.* Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759, 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108 (1895). Currently, however, income from Osage trust property is exempt. The final qualification in *West* may therefore have become effective to remove the restricted property from the state tax even under the *West* opinion itself.[19]

G. On these grounds, we feel compelled to conclude that, because of the developments from *Squire* on, the *West* result is no longer controlling on us, and the opposite holding is mandated here. This leads directly to our ruling that the state tax was not owed, and that plaintiffs are entitled to recover from the United States for its breach of fiduciary duty in paying the tax when it should not. We may turn out to be mistaken, but the decision we make is the one we believe would be "the event of an appeal in the case before us" (Judge Learned Hand, dissenting in Spector Motor Service, Inc. v. Walsh, 139 F.2d 809, 823 (C.A. 2, 1943)).[20]

---

18. In quite different contexts, the Osage Allotment Act contains a few express provisions for taxation by the state. It is not argued that any of these apply to the estate tax as involved here, and we are satisfied that they do not.

19. On the other hand, the Court may possibly have meant to include only property which is immune from direct property taxation (see Oklahoma Tax Comm'n v. United States, 319 U.S. at 610–611). Congress has expressly authorized Oklahoma to collect a gross production tax on minerals, before the headright pro-rata income distribution is made. Acts of March 3, 1921, 41 Stat. 1249, and of April 25, 1940, 54 Stat. 168. Perhaps the Court considered this tax as showing that the involved properties had not been exempted by Congress from direct taxation.

Since defendant sees this production tax as somehow supporting the imposition of the state death tax we note that we cannot infer from an express and limited grant of power to tax a more general and unlimited right which is unexpressed.

20. Judge Hand said:
"It is always embarrassing for a lower court to say whether the time has come to disregard decisions of a higher court, not yet explicitly overruled, because they parallel others in which the higher court has expressed a contrary view. I agree that one should not wait for formal retraction in the face of changes plainly foreshadowed; the higher court may not entertain an appeal in the case before the lower court, or the parties may not choose to appeal. In either event the actual decision will be one which the judges do not believe to be one which the higher court would make. * * * Nor is it desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant; on the contrary I conceive that the measure of its duty is to divine, as best it can, what would be the event of an appeal in the case before it."

## VII.

*Oklahoma's liability to the United States*

If, as we have just held, the Oklahoma estate tax should not have been paid or collected with respect to this Indian trust and restricted property, the state is liable over to the United States, which, as trustee, improperly paid the tax. As trustee, the United States can sue for return of the money. See IV Scott, Trusts (3d ed. 1967) §§ 279 A (at 2321), 280.5 (at 2327, 2328); Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 369–370, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968). The Federal Government expressly asks for such recover over and there is no barrier to grant of that prayer. The state statute of limitations does not run against the United States, whether suing on behalf of Indians or otherwise. See Board of Commissioners v. United States, 308 U.S. 343, 351, 60 S.Ct. 285, 84 L.Ed. 313 (1939); United States v. Summerlin, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940); United States v. John Hancock Mut. Ins. Co., 364 U.S. 301, 308, 81 S.Ct. 1, 5 L.Ed.2d 1 (1960). Nor is the Government's claim for recovery required to be brought in the state court; it may be instituted, as here, in a federal court. *Cf.* Oklahoma Tax Comm'n v. United States, *supra*, 319 U.S. 598, 63 S.Ct. 1284 (1943); Poafpybitty v. Skelly Oil Co., *supra*.

## CONCLUSION

Plaintiffs are entitled to recover from the defendant, their motion for summary judgment is granted, and the defendant's motion is denied as against the plaintiffs. The United States, in turn, is entitled to recover the full amount of the judgment from the State of Oklahoma, third-party defendant, and accordingly the defendant's motion for summary judgment for such relief is granted. The amount of recovery by plaintiffs against defendant and by defendant against third-party defendant will be determined under Rule 131(c).

SKELTON, Judge (dissenting):

I think the majority has fallen into error in refusing to follow the decision of the Supreme Court in West v. Oklahoma Tax Commission, 334 U.S. 717, 68 S.Ct. 1223, 92 L.Ed. 1676 (1948), which it admits involved the identical problem we have in the instant case and is the only decision of that Court that has ever decided the exact question we have before us. That case has never been overruled and the law under which it was decided has not been changed. Consequently, we are required to follow it. Furthermore, it was correctly decided, as will be shown below.

The *West* case involved the power of the State of Oklahoma to levy an inheritance tax on the estate of a deceased restricted (noncompetent) Osage Indian which is the exact question before us in the instant case. The Court held in no uncertain terms that the State of Oklahoma did have such power and the tax was legal because it was a tax on the *transfer* of the property of the noncompetent Indian after his death and not a tax on the trust property itself. The Court said:

> * * * An inheritance or estate tax is not levied on the property of which an estate is composed. Rather it is imposed upon the shifting of economic benefits and the privilege of transmitting or receiving such benefits. United States Trust Co. of New York v. Helvering, 307 U.S. 57, 60, 59 S.Ct. 692, 693, 83 L.Ed. 1104; Whitney v. State Tax Commission, 309 U.S. 530, 538, 60 S.Ct. 635, 638, 84 L.Ed. 909. In this case, for example, the decedent had a vested interest in his Osage headright; and he had the right to receive the annual income from the trust properties and to receive all the properties at the end of the trust period. At his death, these interests and rights passed to his heir. It is the transfer of these incidents, rather

than the trust properties themselves, that is the subject of the inheritance tax in question. In this setting, refinements of title are immaterial. Whether legal title to the properties is in the United States or in the decedent and his heir is of no consequence to the taxability of the transfer.

The result of permitting the imposition of the inheritance tax on the transfer of trust properties may be, as we have noted, to deplete the trust corpus and to create lien difficulties. But those are normal and intended consequences of the inheritance tax. And until Congress has in some affirmative way indicated that these burdens require that the transfer be immune from the inheritance tax liability, the *Oklahoma Tax Commission* case permits that liability to be imposed. * * * [Id. at 727, 68 S.Ct. at 1228.]

As may be seen from the foregoing, the decision is squarely in point, not only on the law question in our case, but also on the facts, as both cases involve the same kind of property of Osage Indians and the same kind of inheritance tax levied by the State of Oklahoma. The majority opinion admits all of this, but refuses to follow the *West* decision. Instead it questions the viability of the *West* case and relies on the decision in Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956), and decisions of various inferior courts.

The *Capoeman* case is clearly distinguishable from the *West* case on both the facts and the law. That case involved the question of whether or not the Federal Government could levy an income tax on the income of living noncompetent Quinaielt Indians derived from the sale of timber cut from lands held in trust for them by the government under the provisions of the General Allotment Act of 1887 (24 Stat. 388, 25 U.S.C. § 331 et seq.). The Court held the income tax on the proceeds of

the sale invalid. In doing so, it quoted with approval an opinion of an attorney general as follows:

" * * * In other words, it is not lightly to be assumed that Congress intended to tax the ward for the benefit of the guardian." [Footnote omitted.] [*Id.* at 8, 76 S.Ct. at 616.]

In that case, the court was dealing with a *direct tax* on the property of a *living noncompetent* Indian, and no inheritance tax imposed by a state was involved. Furthermore, the tax was being imposed on the property of the wards by their guardian during their lifetime. No such facts existed in *West* nor do they exist in our case.

The Court in *Capoeman* showed clearly that it was protecting the property of the noncompetent Indians during their lifetime so that when they became competent their property would not be depleted and they could take their rightful place in society. This is clearly shown by the following statements of the Court:

* * * The purpose of the allotment system was to protect the Indians' interest and "to prepare the Indians to take their place as independent, qualified members of the modern body politic." * * * [*Id.* at 9, 76 S.Ct. at 616.]

* * * Unless the proceeds of the timber sale are preserved for respondent, he cannot go forward *when declared competent* with the necessary chance of economic survival in competition with others. * * * [Emphasis supplied.] [*Id.* at 10, 76 S.Ct. at 617.]

In the case at hand, we are not dealing with a living noncompetent Indian who may someday be declared competent and at that time will need to have his property intact so that he can make his own way in our economic society. Here we are dealing with a deceased noncom-

petent Indian whose noncompetency died with her. All of her property has already been transferred and distributed to her heirs, who, as far as the records show are competent and are not restricted in any way. The Oklahoma tax was levied on the transfer and distribution of the property of the deceased Indian to her heirs. This is exactly the kind of a tax that the *West* decision held to be valid.

The majority discusses other decisions of lower courts and a Revenue Ruling of the Internal Revenue Service to the effect that trust funds of Indians are not subject to Federal income tax or estate taxes. These authorities are not in point because taxes of that kind are not involved here. Furthermore, as the Supreme Court pointed out in *Capoeman*, the ward cannot be taxed by the guardian. The majority notes a few cases of lower courts that Indian trust property is not subject to state inheritance taxes. If those cases involve different Indians whose property is held in trust under different Acts of Congress to the Osage Allotment Act here involved, they are not in point. If they involve the same facts and the same legal questions we have in the instant case, they are in direct conflict with the decision of the Supreme Court in the *West* case and are not controlling. For all of these reasons, I have not discussed them individually.

From the foregoing, it is readily apparent that the *West* decision is viable and controlling, and we are not free to question its viability. Neither do we have the power or authority to overrule it by relying on decisions of lower courts nor by speculating on what the Supreme Court might do sometime in the future if this question should again be presented to it.

I would deny plaintiffs' motion for summary judgment and grant that of the defendant, and dismiss plaintiffs' petition.