**Helen MITCHELL, et al.**

v.

**The UNITED STATES.**

Nos. 772–71 to 775–71.

United States Court of Claims.

Oct. 21, 1981.

Charles A. Hobbs, Washington, D. C., attorney of record for plaintiffs; Wilkinson, Cragun & Barker and Jerry R. Goldstein, Washington, D. C., of counsel.

George R. Hyde, Washington, D. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, DAVIS, NICHOLS, KUNZIG, BENNETT and SMITH, Judges, en banc.

## ON DEFENDANT'S MOTION TO DISMISS

DAVIS, Judge:

In *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), the

Supreme Court reversed and remanded our prior decision in 219 Ct.Cl. 95, 591 F.2d 1300 (1979). We had held that plaintiff Indians could sue the United States for breach of trust relating to federal management of their forest properties, under the trust created in the General Allotment Act, 25 U.S.C. §§ 331–354, but the Supreme Court ruled, to the contrary, that the trust established by that Act did not extend to the management of the allotted lands.[1] The case was remanded to this court to consider plaintiffs' other grounds (which we had not reached) for asserting that the Government is liable in money damages for the alleged mismanagement. 445 U.S. at 546 n.7, 100 S.Ct. at 1356 n.7. On remand, we had argument *en banc* and, except for specified issues, reargument *en banc.* We now hold that plaintiffs are entitled to proceed on most, but not all, of their specific claims (apart from the rejected broad-scale claim under the General Allotment Act). Accordingly, we deny, in largest part, defendant's motion to dismiss.

## I

The now relevant facts and allegations are set forth in the Supreme Court's opinion, 445 U.S. at 536–537, 100 S.Ct. at 1351–1352 and our previous decision, 219 Ct.Cl. at ——, 591 F.2d at 1300–1301. The claims are by Indian allottees of trust lands and timber on the Quinault reservation and by the tribe itself, under the Tucker Act, 28 U.S.C. § 1491 (1976), and its counterpart for Indian tribal claimants, 28 U.S.C. § 1505 (1976). The land is heavily timbered and under various statutes the Federal Government manages it, receives powers of attorney from Indian allottees, contracts for harvesting of timber, and pays the money proceeds to the allottees. Plaintiffs seek to recover from the United States for various alleged deficiencies, including failure to obtain fair market value for timber sold, failure to manage the forests on a sustained yield basis and to rehabilitate the land after log-

ging, failure to obtain any payment or proper payment for some merchantable timber, failure to develop a proper system of roads and easements and exacting improper charges in connection with roads and easements, failure to pay any interest or sufficient interest on monies and funds, exacting excessive administrative fees and charges, and failure to exercise proper care in granting patents to Indians.

Defendant's motion before us asserts that we have no authority to consider these non-constitutional claims against the United States, except perhaps for any which may truly relate to plaintiffs' own monies which have been actually retained or deducted by the Government.

## II

The barrier defendant sees is that, in its view, Congress has not consented to such a suit here, either in 28 U.S.C. § 1491 or § 1505, or through any other statute or regulation which plaintiffs invoke. The concept has been phrased in different ways, but the Supreme Court has firmly established that, for a suit against the United States, there must be a waiver of sovereign immunity shown by "clear congressional consent." *United States v. Mitchell,* 445 U.S. at 538, 100 S.Ct. at 1352. For claims not resting on a contract or for the return of money paid to the Government, but, rather, directly founded on or arising under the Constitution, statutes, regulations, or executive orders, the claimants—Indian or not, individual or tribal—must "look beyond [28 U.S.C. §§ 1491, 1505] for a waiver of sovereign immunity with respect to their claims." *Id.,* at 538–540, 100 S.Ct. at 1352–1353. Those substantive rights against the Government for monetary relief must exist apart from §§ 1491 and 1505. To allow the claim here in those instances, the Constitution, statute, regulation or order must be capable of being fairly "interpreted as mandating compensation by the Federal

---

1. The Court held, 445 U.S. at 546, 100 S.Ct. at 1356, that, on the basis of its objectives and its legislative history and background, the General Allotment Act "cannot be read as establishing

that the United States has a fiduciary responsibility for management of allotted forest lands." *See also* 445 U.S. at 542, 100 S.Ct. at 1354, for the same conclusion.

Government for the damage sustained." *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). It is not enough that the statute (for instance) may ground a claim for specific relief (*e. g.* injunction, mandamus, or direct statutory review); it is also necessary, for action in this court, that the substantive right granted by Congress extend to entitlement to compensation or money damages. *Cf. United States v. Testan, supra*, 424 U.S. at 401–02, incl. n.5, 96 S.Ct. at 954–55, incl. n.5; *Eastport S. S. Corp. v. United States*, 178 Ct.Cl. 599, 608–09, 372 F.2d 1002, 1009–10 (1967).

It is not required, however, that the statute, regulation, or order itself specify that the claimant can bring a lawsuit for compensation in this court (or in the district court if under $10,000). If the source of the substantive right can be fairly read as mandating compensation by the Government, it is needless for Congress to add expressly in that statute that suit may be maintained in this court (or elsewhere) to obtain such monetary compensation. The Tucker Act (28 U.S.C. § 1491) and 28 U.S.C. § 1505 perform that function of giving Congressional consent to jurisdiction in this court over such pecuniary claims. Classic instances of legislation directing compensation, and therefore grounding suit in this court, are the statutes providing for military and civilian pay and allowances (which have not, of course, themselves mentioned suit or the right to sue).[2] Aside from the few instances of gratuitous benefits in which Congress has provided against any judicial scrutiny at all (*e. g.* veterans' benefits), a clear showing that legislation directs compensation or money to be paid to the claimant is enough warrant for a suit in this court under §§ 1491 and 1505.

Nor do we think that the only statutes[3] mandating compensation are those which expressly authorize the payment of the money sought (and proved). As we understand them, neither *Testan* nor *Mitchell, supra*, excludes all non-express indications of the right to compensation, no matter how strong or compelling they may be. Both opinions teach us to look hard and carefully to see whether the statute should fairly be read as mandating compensation—*i. e.*, that reading should be strong and clear—but the Supreme Court's decisions do not say that the substantive right to money must always be explicitly stated in the substantive legislation itself. The overriding principle, rather, is that the statute should be read "with that conservatism which is appropriate in the case of a waiver of sovereign immunity" *United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). In *Testan*, for instance, the Court considered all the factors, including but not limited to the absence of an express legislative statement that pay is due for improper classification and the established rule that one is not entitled to the benefit of a position to which one has not been appointed, in deciding that neither the Classification Act nor the Back Pay Act mandated or allowed compensation in those circumstances. *Mitchell* spoke of "clear" Congressional consent (445 U.S. at 538, 100 S.Ct. at 1352) and, employing that standard, concluded that the present plaintiffs have no substantive right at all under the General Allotment Act with regard to the alleged mismanagement of their forests and property for which they have brought suit. *See* note 1, *supra*. Neither ruling laid down the inexorable requirement of express statement in the legislation of the right to monetary compensation. The only inescapable principle is that Congress's waiver of sovereign immunity with respect to money compensation must be clear or strong before

---

2. The recent Civil Service Reform Act of 1978 does provide specifically for judicial review in this court but obviously that late enactment does not invalidate, or cast doubt on, the hundreds of military and civilian "pay" cases which this court has heard and decided in the preceding decades.

3. We shall often use "statutes" as exemplifying and standing for comparable regulations or orders.

the court can say that the statute mandates compensation.[4]

## III

■■■ In *Mitchell* the Supreme Court remanded to us the question whether the other statutes on which these Indians rely created or recognized fiduciary responsibility on the part of the Government for management of the forest lands, or otherwise render the United States liable in money damages for the alleged mismanagement. In this Part III, we consider the three of those statutes which deal directly with federal management of the plaintiffs' forests and lands.[5] These three are: the so-called 1910 Act, 25 U.S.C. §§ 406–407 (1976) (timber sales); 25 U.S.C. § 466 (1976) (regulations and sustained yield); and 25 U.S.C. §§ 318a, 323–325 (1976) (rights-of-way). We hold that (a) these statutes, giving federal officials full authority to manage Indian forest property and land, created a fiduciary relationship; (b) plaintiffs can recover (if they prove their case) for breach of these fiduciary obligations and obtain the compensation provided by the statutes; but that (c) the recovery will not necessarily be equivalent to that imposed on a private trustee managing his beneficiary's property, but will be limited in reach and scope, though more extensive than defendant would allow.

A. The Government's supervision and control of the harvesting of Indian timber for the Indians' benefit—including the impact of the particular statutes invoked by plaintiffs and the regulations under them— has recently been reviewed in detail by the Supreme Court, *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145–148, 100 S.Ct. 2578, 2584–86, 65 L.Ed.2d 665 (1980), in connection with the effect of state taxes on the entire process of managing forest lands. The Court termed this over-all federal control "comprehensive," involving "day-to-day supervision by the Bureau of Indian Affairs," and giving the Secretary of the Interior "broad authority over the sale of timber on the reservation." *Id.* at 145, 100 S.Ct. at 2584. The statutes provide that timber sales must "be based upon a consideration of the needs and best interests of the Indian owner and his heirs," 25 U.S.C. § 406(a), and call for Interior's rules and regulations relating to "the operation and management of Indian forestry units" to be made "on the principle of sustained yield management." 25 U.S.C. § 466. The Secretary is thus specially authorized to promulgate regulations for the operation and management of Indian forestry units, and he has done so in a detailed set. *White Mountain Apache Tribe, supra*, at 146–48, 100 S.Ct. at 2585–2586. We note, in addition, that the proceeds of timber sales from Indian forest lands are to "be paid to the owner or owners or disposed of for their benefit" under the Secretary's regulations, § 406(a), or (in the case of tribal ownership) are to "be used for the benefit of the Indians who are members of the tribe or tribes concerned in such manner as [the Secretary] may direct," § 407.

The *White Mountain Apache Tribe* opinion summed up the "overriding federal objective" to be: "guaranteeing Indians that they will 'receive * * * the benefit of what profit [the forest] is capable of yielding * * * ' " (quoting the Secretary's own regulations), and declared that "the Federal

---

4. In refusing to accord us jurisdiction beyond that historically recognized in this court, the Supreme Court may be said sometimes to have rested almost exclusively on the absence of an express Congressional statute waiving sovereign immunity. *United States v. King*, 395 U.S. 1, 4–5, 89 S.Ct. 1501, 1502–03, 23 L.Ed.2d 52 (1969) (lack of declaratory judgment power); *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957) (non-tolling of limitations beyond statutory provisions). But this extremely strict requirement of an express statute, if it be a true *sine qua non* at all,

has not, we think, been extended to a *substantive* claim within the Tucker Act—*e. g.* a monetary claim founded on an Act of Congress. *Cf. United States v. Emery, Bird, Thayer Realty Co.*, 237 U.S. 28, 32, 35 S.Ct. 499, 500, 59 L.Ed. 825 (1915).

5. The remaining statutes are discussed in Part IV, *infra*; the constitutional and contractual claims are touched on in Part V, *infra*; exhaustion of administrative remedies is considered in Part VI, *infra*.

Government has undertaken to regulate the most minute details of timber production and expressed a firm desire that the Tribe should retain the benefits derived from the harvesting and sale of reservation timber." 448 U.S. at 149, 100 S.Ct. at 2586.

B. Because the forest and property are Indian-owned, this Congressional legislation, envisaging comprehensive operation and management by the Government for the Indians' benefit, created a fiduciary relationship between Interior and the Indians. We have held that "where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. ——, ——, 624 F.2d 981, 987 (1980). This principle has dominated the Government's relations with Indian property for about two centuries. *See, e. g., Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831); *United States v. Kagama*, 118 U.S. 375, 382, 6 S.Ct. 1109, 1113, 30 L.Ed. 228 (1886); *United States v. Payne*, 264 U.S. 446, 448, 44 S.Ct. 352, 353, 68 L.Ed. 782 (1924); *Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054–55, 86 L.Ed. 1480 (1942); *United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973). The long-continuing doctrine of governmental fiduciary obligation in the management of Indian property was, we think, infused into the 1910 and later statutes, even though the word "trust" was not used in that legislation. The General Allotment Act did not itself establish a fiduciary obligation for manage-

ment of these forest lands (*United States v. Mitchell, supra,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607), but the later Acts we have mentioned (and the ensuing regulations), which dealt specifically with the Indians' forests, have broadened the special trust imposed by the Allotment Act to create a general fiduciary obligation on the Government in the management and operation of the forest lands with which Interior was entrusted. Nothing in those three Acts says or suggests that Congress wished, contrary to historical principle, to depart from the norm of fiduciary duty. *See United States v. Anderson,* 625 F.2d 910, 915 (9th Cir. 1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1367, 67 L.Ed.2d 347 (1981).[6]

C. The crucial question is whether, and to what extent, Congress has consented to a monetary claim in this court by the Indian plaintiffs for alleged violation of those fiduciary duties. Under the wider statutory provisions relating to pre-August 1946 claims filed before the Indian Claims Commission (*United States v. Mitchell, supra,* 445 U.S. at 540 n.2, 100 S.Ct. at 1353 n.2), there is no question that such a suit could be brought before the Commission (and continued in this court as the Commission's successor). *Navajo Tribe of Indians v. United States, supra.* But the current claims, which arose after 1946 and were filed here in 1971, are controlled by the narrower provisions of 28 U.S.C. §§ 1491 and 1505. *See Menominee Tribe of Indians v. United States,* 221 Ct.Cl. 506, ——, 607 F.2d 1335, 1340–41 (1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980). For recovery (as we said in Part II, *supra*), a statute or authorized regulation must clearly mandate compensation.[7]

We think that Congress did mandate, in the three sets of statutes to which we have

---

**6.** The *Anderson* court said that 25 U.S.C. § 466, *supra,* with its broad-scale direction to the Secretary to make rules and regulations (under prescribed standards) for the operation and management of Indian forestry units, involved an undertaking by the Government to manage the land resources of the Indians for the Indians' "optimum economic benefit."

**7.** Again we by-pass (see our prior *Mitchell* opinion, 219 Ct.Cl. at ——, 591 F.2d at 1301–02) the phrase in 28 U.S.C. § 1491 giving this court jurisdiction over claims against the United States for "liquidated or unliquidated damages in cases not sounding in tort." Plaintiffs do not rely on that clause which has never been fully and authoritatively construed but rather on specific legislation as founding their claims.

referred *supra*,[8] a restricted degree of compensation for violations of traditional fiduciary responsibilities in the management of Indian property. These are therefore claims for monetary compensation founded on, and mandated by, Congressional legislation. The ultimate principle we find in these Acts is that plaintiffs can sue under that legislation both for (a) any fall-off from the income they would have received from their forests and lands if the Government had properly complied with the directives of the statutes and regulations, and (b) the value (or decrease in value) of their property which is lost (or diminished in value) through improper actions of Interior. But there can be no recovery for other, consequential, indirect damages which a private cestui might possibly recover because of his trustee's derelictions. We now consider the three statutes in turn.

1. *25 U.S.C. §§ 406–407 (timber sales):* As we have pointed out, this legislation (originally enacted in 1910) expressly requires the proceeds of timber sales made by the Government from the individual plaintiffs' lands to "be paid to the owner or owners or disposed of for their benefit under regulations to be prescribed by the Secretary of the Interior", § 406(a), and (in the case of the tribe) the proceeds are to "be used for the benefit of the Indians who are members of the tribe or tribes concerned in such manner as [the Secretary] may direct," § 407. These provisions indisputably direct compensation (and therefore allow suit) for the actual proceeds of actual sales not remitted to or used for the Indians. But that is not the outermost limit of the Indians' right to sue in this court. Congress had a longer reach. It created a fiduciary relationship through this statute and required that sales must "be based upon a consideration of the needs and best interests of the Indian owner and his heirs." § 406(a). That was always the ultimate goal. The first (1911) Interior Department regulation declared that the legislation called upon Interior to "so manag[e] the Indian forests as to obtain the greatest revenue for the

Indians consistent with a proper protection and improvement of the forests."

Having imposed this umbrella of fiduciary relationship and given Interior comprehensive over-all authority for the Indians' benefit, Congress did not, we think, confine the Indians to the actual proceeds of actual sales, barring them entirely from seeking (under the proper standard, *see* Part III, D, *infra*) compensation for other violations by Interior of its fiduciary duty "to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests," *Id.* To us, Congress has authorized the Indians to claim compensation for a breach of the trust Congress has itself fixed in order that the beneficiaries shall receive the benefits Congress plainly contemplated for them. A trust normally entails the right to compensation for the trustee's breach (G. Bogert, The Law of Trusts & Trustees § 862 (2d ed. 1965); 3 A. Scott, The Law of Trusts § 205 (3d ed. 1967)), and this statute does not in any way suggest otherwise. Under the terms of the statute, therefore, plaintiffs can recover the difference between the actual proceeds and the greatest appropriate revenue which should have been obtained. The statutory term, "proceeds" of tribe sales, can and should be read, in context, as the proceeds of the sales which should have been made under proper management—not merely the actual proceeds of actual sales.

If we were to confine suit to the bare actual proceeds received from actual sales, we would exclude those of plaintiffs' claims that assert that the Government failed (i) to obtain fair market value, or any compensation at all, for some of the timber, and (ii) to follow the regulations in making advance payments to the plaintiffs so that they received payments late (and therefore their gains were unlawfully diminished). There is no reason to think that Congress mandated compensation for a failure to turn over actual proceeds of actual sales but not for these other, intimately related failures. In the light of the fiduciary relationship, that would be extraordinary and without any reason given.

**8.** 25 U.S.C. §§ 318a, 323–325, 406–407, 466. *See* text at note 5, *supra*.

2. *25 U.S.C. § 466 (regulations and sustained yield)*: This statute (first passed in 1934) directs Interior to manage Indian forests "on the principle of sustained yield management."[9] Congress considered this necessary to "assure that the Indian forests will be permanently productive and will yield continuous revenue to the tribes." 78 Cong.Rec. 11730 (1934). *Cf. White Mountain Apache Tribe v. Bracker, supra*, 448 U.S. at 146, 100 S.Ct. at 2585. This 1934 Act plainly implemented the timber sales provisions (discussed *supra*) already in existence since 1910. *See* 78 Cong.Rec. 11730 (1934). These statutes and the relevant regulations, fairly read together, mandate compensation for improper Interior activity, contrary to fiduciary obligations imposed by the legislation and regulations, which has led to the direct loss, or diminution in value, of the plaintiffs' forests or the proper gain from those forests.

Congress wanted not only to protect Indian forests land from a value-loss occasioned by improper Government violation of sustained yield principles but also to compensate the Indian owners[10] for the amount of that unwarranted value-loss if it should be proved. This was Indian property and any remedy there might be through prospective affirmative relief would often be too late for much, if not most, of the injury.[11] Interior had been given fiduciary responsibilities for which pecuniary remedies are commonly available in our general law. Without a monetary remedy, the Indians could lose substantial elements of their own property without anything to deter the federal officials (who were directed to manage that property for the benefit of the Indians) from violating the governing directives, and without any compensation for that past loss. Though the 1934 Act did not itself say in express words that the Indian owners were to receive the financial benefits of sustained yield principles, that was its necessary meaning.[12] The property was Indian and Congress put it under the comprehensive fiduciary control of the Government; such direct and continuous management of Indian forest property by federal officials was no more purely "governmental" than management of Indian funds in the hands of the Government—a matter which has long been subject to suit for improper action, once there is a statute comparable to 28 U.S.C. §§ 1491 and 1505. *See* Part IV, *infra*.

3. *25 U.S.C. §§ 318a, 323–325 (roads and rights-of-way)*: This legislation provides for (a) appropriations for improvement, construction, maintenance, etc. of roads on Indian reservations (to be used under Interior

---

**9.** 25 U.S.C. § 407, relating to the sale of timber on unallotted lands, also provides that the timber "may be sold in accordance with the principles of sustained yield * * *."

**10.** In 1934, when this statute was passed, the only Indian owners who could sue were individuals, but 28 U.S.C. § 1505 gave that opportunity to Indian tribes in 1946.

**11.** In 1934, even the opportunity for seeking affirmative relief against federal officials was problematic. There was no general consent-to-suit comparable to 5 U.S.C. § 702 (1976), and the defense of sovereign immunity was often raised in litigation seeking injunctive or mandatory relief involving property of which the Government held bare legal title. *E. g. Naganab v. Hitchcock*, 202 U.S. 473, 475–76, 26 S.Ct. 667, 668, 50 L.Ed. 1113 (1906).

**12.** It is very hard to believe that Congress, for example, would exclude Indians whose forests were wholly or largely wasted, because of federal officials' gross failures to follow the principles of sustained yield, from recovering compensation for that loss. There is no administrative channel for obtaining compensation, and prospective judicial relief by way of injunction or declaratory relief (to the extent it existed at all, *see* note 11, *supra*) would not avail for damage already done. An eminent domain suit for just compensation would probably be barred because of lack of Congressional authority to take the property by negligent or intentional waste. *See* note 13, *infra*. In *Menominee Tribe of Indians v. United States*, 117 Ct.Cl. 442, 91 F.Supp. 917 (1950), this court expressly held that violation of an earlier specific statute directing the equivalent of sustained yield for the Menominees rendered the United States liable for violation of that principle, even assuming that the later special act under which that suit was brought did not create liability but merely gave jurisdiction to this court. 117 Ct.Cl. at 499–501, 91 F.Supp. 917. In the present case, that jurisdiction is conferred by 28 U.S.C. §§ 1491, 1505.

regulations), § 318a and (b) grants of rights-of-way over Indian land with "payment of such compensation as the Secretary of the Interior shall determine to be just" (again under Interior regulations), 25 U.S.C. § 325. This legislation, too, clearly mandates compensation to the Indians for failing to obtain just payment for their loss of value because of federal failure to obtain adequate payment from grantees, to restore rights-of-way to original condition, and for improper deduction of the cost of maintaining roads. Of course, a suit may always be maintained to the extent a strict Fifth Amendment taking can be claimed. But *Coast Indian Community v. United States,* 213 Ct.Cl. 129, 550 F.2d 639 (1977), correctly allowed recovery for the improper grant of a right-of-way although the court could not find a constitutional taking.[13] The right-of-way statute expressly contemplates "just" pay to the Indian owners, without limiting suit to a Fifth Amendment taking. It cannot be that Congress intended no payment at all for rights-of-way incorrectly granted by Interior without proper authority. Moreover, when read *in pari materia* with the other forest control statutes (just discussed), these right-of-way provisions authorize compensation for loss of income or property value occasioned by Interior's unjustified failure or refusal to build or maintain the roads called for by proper harvesting and forest care.

4. *Summary:* The common thread of the statutes we have just construed as contemplating compensation to the Indians is that they all (a) deal with Indian-owned property, (b) directed to be managed and controlled by federal officials as fiduciaries, (c) in the express interest of and for the benefit of the Indians, and (d) from which Congress clearly wanted the Indians to obtain the financial benefits. In sum, this is a typical Indian trust relationship involving monetary benefits to the beneficiary. In those circumstances it cannot be said that the Congress was merely "regulating" Indian affairs, as it does many other facets of our national life; rather, Congress contemplated that the Indian property owners would receive income from their property while managed by the fiduciary Government, or the appropriate value of the property if it was transferred by the federal managers or if the managing federal officials improperly lost or destroyed it or decreased its value. There is no difficulty in construing these particular pieces of legislation to mandate this kind of compensation (if the facts are proved) even under the strict standards called for by the Supreme Court. Congress itself, and not merely a governmental unit, has envisaged and mandated in these statutes the payment of this type of money.[14]

D. We hold, however, that plaintiffs are not entitled to sue for other types of dam-

**13.** In *Coast Indian Community,* the alleged taking was done without the necessary legislative authority (the federal officials failed to follow the specific requirements Congress laid down) and accordingly a Fifth Amendment taking could not be found. That would appear to be a not uncommon happening.

**14.** In enacting 28 U.S.C. § 1505 in 1946 (first passed as section 24 of the Indian Claims Commission Act of 1946, ch. 959, § 24, 60 Stat. 1055) Congress seems to us to have affirmatively expected that post-1946 monetary legal claims for governmental breach of trust under past and future federal statutes would be brought by Indians in this court. Congressman Jackson, committee chairman and principal sponsor of the bill in the House of Representatives, said: "The Interior Department itself has suggested that it ought not to be in a position where its employees can mishandle funds and lands of a national trusteeship without com-

plete accountability" and "let us see that the Indians have their fair day in court so that they can call the various Government agencies to account on the obligations that the Federal Government assumed." 92 Cong.Rec. 5312 (1946). *See also,* H.R.Rep.No.1466, 79th Cong., 2d Sess., *reprinted in* [1946] U.S.Code Cong. Serv. 1347, 1351 (referring to the proposed act as opening this court to Indian cases where "fiduciary duties have been violated" and to the "victims of their maladministration"). Section 1505 did not itself create the underlying substantive right to monetary compensation, and may not have, by itself, waived sovereign immunity for suits under the legislation involved here, but it is noteworthy that the 1946 Congress which molded the § 1505 provision for suit in the Court of Claims apparently expected that violations of fiduciary duty could be redressed in an action here for monetary compensation.

ages or compensation: indirect or consequential business, economic, or personal damages due to the loss (total or partial) of their property, or personal, psychological, or social harm experienced by the Indian owners or the tribe as a consequence of federal mismanagement of their property. These are not clearly included in the legislation plaintiffs invoke; the statutes concern property and its rightful proceeds. The only compensation for which plaintiffs can sue in this court, under the legislation on which they rely, is direct loss or diminution in value of their property (and its proceeds) due to mismanagement by federal officers.

It should be added that the standard by which Interior's actions are to be judicially tested is, not the court's or plaintiffs' own view of the preferable conduct, but the normal standard for government fiduciaries—were their actions in good faith and within the realm of their acceptable discretion, or were they arbitrary, capricious, in abuse of discretion, or contrary to law? We repeat, too, the caution that all the rules governing the relationship between private fiduciaries and their beneficiaries do not necessarily apply in full vigor to Indian claims against the United States. "In each situation, the precise scope of the fiduciary obligation of the United States and any liability for breach of that obligation must be determined in light of the relationships between the Government" and the Indians. *Navajo Tribe v. United States, supra,* 224 Ct.Cl. at ——, 624 F.2d at 988.[15]

## IV

■ This part of our opinion treats the various other non-constitutional, non-contractual claims raised by plaintiffs. Several concern Indian funds in the hands of or controlled by the Federal Government. One contention is that the administrative fee-deductions authorized by Congress from proceeds payable to or for the Indians (25 U.S.C. §§ 406, 407) were excessive or improper in certain respects. There is undoubted consent-to-suit for such claims that the Government illegally kept some of the Indians' own money or property. *See United States v. Testan, supra,* 424 U.S. at 400, 401, 96 S.Ct. at 954, 955; *Eastport S. S. Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1007–08 (1967).[16] The same is true of other illegal withdrawals from funds received from loggers for these Indians, as well as for misapplication of trust funds required by law to be paid to plaintiffs or applied to their benefit.

A somewhat different problem involves interest. Our decision in *Cheyenne-Arapaho Tribes of Indians v. United States,* 206 Ct.Cl. 340, 512 F.2d 1390 (1975), deals with interest on Indian funds for the period after the August 1946 closing-date of Indian Claims Commission claims. Briefly, tribal trust funds and proceeds of the sale of Indian lands must be held in the Treasury at interest under 25 U.S.C. §§ 161a and 161b (1976), but an alternative under § 162a is deposit in banks; this also applies to the funds held by the United States for individual Indians, 25 U.S.C. § 162a (1976). The bank deposits are subject to rigid statutory precautions to assure complete safety. The holding of *Cheyenne-Arapaho* is that defendant must as trustee exercise reasonable management zeal to get for the Indians the best rate, the statutory 4% being but a floor, not a ceiling. *United States v. Mescalero Apache Tribe,* 207 Ct.Cl. 369, 518 F.2d 1309 (1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), which defendant says overruled *Cheyenne-Arapaho,* did not do so; it involved different statutes and periods of time from those with which we were concerned in *Cheyenne-Arapaho* and are concerned with here.[17]

---

**15.** We intimate, of course, nothing on the merits of the claims under the proper standard. On the present motion, plaintiffs are entitled to the chance to prove their case. Whether they will do so or not, we do not know.

**16.** We pointed out the same principle in an unreversed part of our first *Mitchell* opinion, *supra,* 219 Ct.Cl. at ——, n.19, 591 F.2d at 1305, n.19.

**17.** The controlling standards for determining breaches of the fiduciary obligations considered

The proceeds actually paid to plaintiffs under the statutes construed in Part III, *supra*, obviously should include interest which should have been earned or allowed on those underlying proceeds. The payments made to the Indians are enhanced by previous investment proceeds just as they are reduced by administrative expenses properly chargeable. Plaintiffs are not entitled, however, to such interest on any unpaid amounts they may now recover in the present suit under Parts III and IV, *supra*. Those sums or their equivalent were never held by the Government for plaintiffs, were not subject to the specific interest provisions we have just discussed, and there is no statute awarding back-interest on such unpaid compensation now awarded by the court in this suit. 28 U.S.C. § 2516(a) (1976) allows "interest on a claim against the United States" in a judgment of this court "only under a contract or Act of Congress expressly providing for payment thereof." There is no more warrant for including back-interest in a judgment on claims for unpaid compensation in this case than in the myriad of other non-constitutional suits (including Indian claims) in which we cannot award interest. *See, e. g., United States v. Alcea Band of Tillamooks*, 341 U.S. 48, 49, 71 S.Ct. 552, 553, 95 L.Ed. 738 (1951).

Finally, on the non-constitutional claims, we deny entitlement to any recovery under 25 U.S.C. §§ 349, 377 (1976) (and their regulations), which deal with the issuance of fee patents to Indians found by Interior to be competent. Though the underlying land is held in a limited trust (*see United States v. Mitchell, supra*), this fee-patent legislation suggests little of the assumption of fiduciary responsibility,[18] and does not involve management of property by the Government itself; it is much closer to non-Indian licenses or permits like that involved in *Eastport S. S. Corp. v. United*

*States, supra*, 178 Ct.Cl. 599, 372 F.2d 1002. The statutes seem almost purely regulatory, invoking Congress's plenary power over Indians, and do not themselves mandate any compensation to the plaintiffs for such alleged injuries as failing properly to determine whether or not an Indian was competent to obtain an allotment, or for issuing patents to incompetents despite the statute.

## V

Defendant does not deny plaintiff's right to pursue constitutional claims for a taking under the Just Compensation clause, and it is beyond question that these can be brought in this court. *See, e. g., United States v. Mitchell, supra*, 445 U.S. at 540 n.2, 100 S.Ct. at 1353 n.2.

Plaintiffs also, rather weakly, state their claims as founded on express or implied contracts. The powers of attorney from the owners to the Government do not contain any express commitments against mismanagement in exercising the powers. There are also timber sales contracts, but these are between the Indian owners (represented by the defendant's employees) and the lumber companies, and are not enforceable against the United States in the Court of Claims. *See United States v. Algoma Lumber Co.*, 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260 (1939).

It could be that the contractual obligations plaintiffs invoke are implied at law, but, if so, they are outside our province. If, however, plaintiffs can show any actual contracts to manage properly, by and between themselves and defendant—express or implied in fact—they may amend their petitions to allege such actual agreements, under the monitoring of the Trial Division according to our rules. Such new allegations should be at least specific enough to call for a trial on the existence of the contracts, or to be capable of being backed

---

in this Part IV, are, of course, the same as the standards for federal fiduciaries discussed in Part III, D, *supra*. This is likewise true of the limits on recoverable compensation.

18. The purposes of the special trust provision of the General Allotment Act, as discussed by the Supreme Court in *Mitchell, supra*, 445 U.S. at 542–545, 100 S.Ct. at 1354–1356, did not include a true fiduciary or guardianship relationship toward the Indian-owners.

up by documentary or affidavit support on a motion for summary judgment.

## VI

On the issues of excessive charges against payments collected for timber sales and failure to earn sufficient interest on Indian funds in Government hands, defendant now says that Helen Kirschling, formerly Helen Mitchell, has exhausted her administrative remedies but the other plaintiffs (close to 1500 in number) have not. This contention comes too late. Mrs. Kirschling's administrative appeal was filed long after suit was brought in January 1971, and related only to excessive charges, not interest. The Board of Indian Appeals regarded the issue to be discretionary and referred the matter to the Assistant Secretary, who denied the appeal in the exercise of his discretionary authority. Defendant's original motion to dismiss did not address this exhaustion issue, nor did we in our earlier ruling. We conclude that no administrative appeal relating to these questions was prescribed as mandatory, and in any event defendant waived it by not earlier advancing the defense. Even if, however, exhaustion was a definite prerequisite to suit, one test appeal must be regarded as enough in these circumstances. The adverse secretarial decision in no way turned on any feature of Mrs. Kirschling's case which was not equally present in all the others. It would be a useless formality to require each of the multitude of claimants to go needlessly through the same course. The exhaustion doctrine was not devised in order to multiply futile paperwork only to achieve a preordained result.

### Conclusion

Defendant's motion to dismiss is denied except as indicated in this opinion. These cases are returned to the Trial Division for further proceedings in accordance with this opinion.

NICHOLS, Judge, concurring and dissenting:

The following summary will show how far I would go in entertaining the claims now before us. I believe we have jurisdiction over claims for—

1. Improper deductions from proceeds of timber sales for administrative expenses.
2. Failure to invest tribal funds as allowed by law, to obtain the best available interest.
3. Taking claims, which are not subject to *Testan* analysis.

The *Testan* or strict construction analysis will not allow plaintiffs to prosecute in this court claims for—

1. "Mismanagement" and its precuniary consequences, as *e. g.*, in failure to plan, failure to locate logging roads to minimize erosion, etc.
2. Breach of congressional requirements as by clear cutting where the law requires sustained yield.
3. Issuing fee patents to incompetent Indians, or money proceeds therefrom, resulting in dissipation of Indian assets.

I therefore respectfully differ with Parts II and III, but agree with and join in Parts IV, V, and VI. I agree with the court as to four out of six categories of claims.

The court agrees that the consent to suit cannot be implied but must be unequivocally expressed; however, it asserts that given the Tucker Act, a substantive obligation plus a strong and clear implication that money is to be paid for breach of the substantive obligation is enough. The substantive obligation here is to manage Indian timberland in an exemplary fashion. The strong and clear implication here is apparently in the mind of the judges only. No attempt is made to show an expression of it by Congress in the statutory language or in the legislative history. The reasoning is, in a nutshell, that in the statutes relied on, read together, Congress has created substantive duties for Interior Department officials to carry out, functions to perform, that strikingly resemble those of a private trustee respecting trust property. It is universally held that a private trustee is personally liable for misperformance of his duties. Therefore, the symmetry of the law requires that the United States (not the

erring officials) be liable also. This is the strong and clear implication.

This implication is in cold reality but a strong and clear wish on the judge's part. And I will say for myself, I share it. I hope to live so long as to see the day when the Congress will amend the Tucker Act to make it say: "this consent to be sued shall be liberally construed to effectuate the purpose of Congress, which is that (except where statutes expressly declare otherwise) the United States shall be liable for whatever wrongs a private body would be liable for in a comparable situation, and those for which the United States would have been held liable, but for absence of consent to suit." I cannot join in efforts to achieve this result by judicial fiat. I think it achieves no overall benefit to the injured claimants and in the end hurts this court, however much it may establish our credentials as persons of good will. It is counterproductive for lower court judges to try to enact the dynamic and positive role of the Supreme Court instead of the one the Supreme Court has assigned to them.

This court has repeatedly failed to take the doctrine of strict construction of the consent to be sued with sufficient seriousness, and apparently nothing can shake its obstinate adhesion to error, to which it repeatedly returns like an alcoholic to the bottle. Such judicial recidivism is peculiarly unfortunate in the case of Indian claims, where it makes the 1946 cutoff date under 25 U.S.C. § 70 and ff for the prosecution of Indian moral claims appear to be of no practical importance. If a correct jurisdictional holding by us did not help in procuring the legislation above suggested, it perhaps could further a shift of the 1946 date to a later one, as it appears apparent that Indian real or alleged wrongs did not suddenly end in 1946, as the Congress fondly imagined they would or had.

We might, as a hypothetical, ardently wish that the United States should be liable under the Tucker Act for maladministration of bankrupt estates. We could point out that the duties of bankruptcy trustees are strikingly similar to those of equity receivers, private individuals who served under the supervision of state equity courts in the old days, and who undoubtedly were a category of trustees, personally liable for misfeasance respecting property in receivership. We could be perfectly consistent with today's holding, in entertaining a Tucker Act suit based on a bankruptcy trustee's misfeasance, but of course we will not, because we do not ardently desire to take jurisdiction in the bankruptcy field, and therefore we would perceive no strong and clear implication.

There follows, Part I, some general comments on the scope of the strict construction doctrine. Part II, the correct technique of applying it to the case at hand, and Part III how I would deal with specific classes of claims.

I

Our problem is to determine which, if any, of the various clauses of plaintiffs' claims fall within the defendant's waiver of sovereign immunity and consent to be sued. Consent must be granted by Congress and "cannot be implied but must be unequivocally expressed" as the Supreme Court again reminds us in its *Mitchell* decision, 445 U.S. 535, 538, 100 S.Ct. 1349, 1352, 63 L.Ed.2d 607 (1980), quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). The task has historically been difficult for Court of Claims judges, and their District and Circuit judge counterparts sitting as courts of claims under 28 U.S.C. § 1346. None of us have always been right. Even those well informed as to the above limitations are likely to imagine existing statutory consents to be broader than they really are. Skilled members of the bar are frequently taken aback by limitations on the jurisdiction of this court previously unsuspected by them. Members of the lay public often petition here in the belief we are some kind of ombudsman, and are amazed to be opposed by able government counsel urging technical jurisdictional objections. These expectations derive from oversweeping rhetoric, as, *e. g.*, the quotation from President Lincoln that decorates

our lobby, "[i]t is as much the duty of Government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private citizens." Cong. Globe, 37th Cong.2d Sess. app. at 2 (1862), the statement that we are "the conscience of the Nation" and even, one is tempted to add, Justice (formerly Mr. Justice) Holmes in *United States v. Emery*, 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825 (1915)—

[It is an] inadmissible premise that the great act of justice embodied in the jurisdiction of the Court of Claims is to be construed strictly and read with an adverse eye. * * *

Though such notions have never been fully adopted by Congress or the courts, they permeate imperceptibly into the minds of Court of Claims judges with the result that reversals of this court on jurisdictional issues by the Supreme Court almost always turn on error in that this court construed its own statutory jurisdiction too broadly. *Amell v. United States*, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966) is an example of the opposite, but it stands virtually alone. As a broad rule of thumb it might be stated that if we judges of the Court of Claims have doubts about our own jurisdiction, the correct answer probably will be that we have none. That the construction of statutory consents to suit must be strict is also a safe generalization. Some examples of strict construction follow, touched on briefly as they lie on the periphery of our argument.

The original 1887 Tucker Act consented to suits in this court on certain stated classes of claims—

* * * [I]n respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable. [24 Stat. 505]

In *United States v. Jones*, 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889), the Court held that this language did not consent to a bill in equity for specific performance of a contract to sell land. The Court limited the "equity" reference to claims for money arising out of equitable demands. At that time, as the Court pointed out, managing the public lands was a "political" function in which the interference of the judiciary seemed unthinkable. Consent to suits for money seemed more natural and more in accord with the enlightened expectations of jurists. Now, however, equitable relief against the government is more acceptable than money judgments. Consent to suits for injunctive and declaratory relief against the government is virtually unlimited, 5 U.S.C. § 702, while consent to suits for money are still stringently limited. However, the exclusion of equitable relief from the jurisdiction of this court still stands unchanged. *United States v. King, supra.* The *Jones* case is on the periphery of the argument here because, as we stated in *Mitchell I*, plaintiffs herein invoked trust doctrines developed on the equity side of the courts before the merger of law and equity, but did not run counter to *Jones* because they did not claim other than money damages.

In *Hopkins v. United States*, 206 Ct.Cl. 303, 513 F.2d 1360 (1975), the plaintiff, a discharged employee of a nonappropriated fund agency, sued under the Tucker Act amendment that extended its coverage to an "express or implied contract" of such agencies, not previously covered. 84 Stat. 449. Defendant urged that plaintiff's relationship as an employee was, under the normal federal rule, not contractual. The legislative history showed that the amendment was intended to correct the result of cases denying relief, one of which had been a suit by a discharged employee. In other than a consent to suit context, it might well have been held that Congress could effect its intent even using technically incorrect language, if the intent was nevertheless manifest. However, faced with the strict construction canon, this court attempted to effectuate the intent of Congress with a somewhat laborious showing that employment in a nonappropriated fund agency was under an implied contract. The Supreme Court, however, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976), held that employees of such agencies could invoke the amend-

ment only on the basis of evidence that their employment was in fact contractual, and in the absence of such evidence in the record, remanded for further proceedings on that question. Thus it seems clear that the congressional effort to better the position of employees of nonappropriated fund agencies, if the amendment was indeed so intended, misfired because of incorrect use of technical language, and as a practical matter, employees of such agencies do not now sue in this court frequently, if at all.

It also appears that the possibility of a repeal by implication is viewed more favorably in consent to sue context. The demise of this court's admiralty jurisdiction is a striking example of that. The Tucker Act language already quoted granted admiralty as well as equity jurisdiction, and up to 1932 this court routinely exercised . it in cases sounding in contract, e. g., *Alaska Exploration Co. v. United States*, 44 Ct.Cl. 392 (1909); *Bull Insular S.S. Co. v. United States*, 62 Ct.Cl. 338 (1926). However, in *Matson Navigation Co. v. United States*, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932), in affirming a decision here on different grounds, 72 Ct.Cl. 210 (1931), the Supreme Court held that the 1920 Suits in Admiralty Act, 41 Stat. 525, which consented to admiralty suits against the United States in the district courts, repealed the Tucker Act *pro tanto*. The 1920 Act did repeal all acts and parts of acts in conflict therewith. That is its only reference to the Tucker Act. In other than a consent to suit context, it would not be thought one statute was in conflict with another solely because they provided different avenues for the litigant to follow in seeking to right the same wrong. The *Matson* decision was in effect ratified by Congress and it is not intended to suggest that, absent further legislation, an admiralty claim could be pursued here under the Tucker Act today.

As to partial repeals by implication of consents to suit, *see also Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), we have recognized the occurrence of such partial repeals in *Whitecliff, Inc. v. United States*, 210 Ct.Cl. 53, 536 F.2d 347 (1976), *cert. denied*, 430 U.S. 969, 97 S.Ct.

1652, 52 L.Ed.2d 361 (1977), and in *Fiorentino v. United States*, 221 Ct.Cl. 545, 607 F.2d 963 (1979), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980).

The doctrine of strict construction is subject to some abatement when it is perceivable that rigorous application of it would deny a constitutional right. *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491, 51 S.Ct. 229, 232, 75 L.Ed. 473 (1931). *See Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977). But the doctrine of strict construction is not one of those that receive mere lip service. It will not go away, it does mean business, and it does mean us. Our decision, *Mitchell I*, is somewhat tainted by the fallacy that plaintiffs must be entitled to recover because they have no other remedy. So far as the claims are constitutional, this is a factor, otherwise, it is not. As said in *United States, v. Testan*, 424 U.S. 392, 403, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1976), being without a remedy in the Court of Claims is not the same thing as being without a remedy *simpliciter*. Defendant points out the plaintiffs had the benefit of the unrestricted consent to injunctive and declaratory adjudications in 5 U.S.C. § 702. As to tribal claimants, the historic policy of Congress, uniformly adhered to up to 1946, was itself to deal directly with tribal claims and refer only selected ones to the courts under ground rules for adjudication expressly spelled out for the case. As regards individuals, consents are broader and have existed longer, but there can be no pretense that the government can be sued in every class of case where a private corporation could be sued, Mr. Lincoln's stated ideal.

## II

We turn now to the technique for applying the doctrine of strict construction to the class of case here involved. The Supreme Court in its *Mitchell* refers us to what it considers the leading opinion on this, *United States v. Testan, supra*. The provision of the General Allotment Act that we had relied on stated that the involved allottees'

lands were to be held in trust for "the sole use and benefit of the Indian to whom the allotment is made." The reliance was held mistaken because as a matter of substantive law the quoted words did not impose on the United States the obligation to manage the allotments. Reference to the legislative history showed the purposes were to prevent alienation and shield against state taxation, purposes not inconsistent with the Indians managing the timber harvest themselves. The Court wanted us to reexamine the entire complex of law relied on by the Indians, to see whether the necessary substantive law and consent to suit can be spelled out from them.

The Court, in *Testan*, puts aside the cases of contract litigation, illegal retention or withholding of money (including tax cases), and fifth amendment takings. There may be other instances where the *Testan* analysis does not apply. I do not think the list of exclusions was meant to be complete. Except for the exclusions, which whatever they are, obviously do not include either the *Testan* or the *Mitchell* claims themselves, the analysis appears to demand three elements in a valid consent to be sued, as follows:

The claimant must show statutes creating or recognizing—
(a) a substantive right;
(b) to recover money damages;
(c) within the jurisdictional coverage of the Tucker Act.

Claimants in *Testan* wanted their federal positions reclassified upward and the Court conceded, as did defendant, that they had a substantive right to proper job classification, though enforceable otherwise than by money damages in the Court of Claims. The error of this court was in mistaking this substantive right for a congressional mandate to effectuate its enforcement in back pay. What was missing was element (b), an unequivocal expression by Congress that the misclassification, when found, was to be rectified by back pay in the form of damages. This serves to differentiate the *Testan* case from *Mitchell*, where a careful reading of Justice Marshall indicates that

element (a), the substantive right, was the one missing.

The *Testan* analysis purports to derive from, and cites with approval, our case, *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967), in which, however, this sharp distinction between substantive right and authority to award damages for its violation is not drawn. In *Eastport* we said, 178 Ct.Cl. at 606, 372 F.2d at 1008 "some specific provision of law [that] embodies a command to the United States to pay the plaintiff some money, upon proof of conditions which he is said to meet," is what is required in the category of cases not involving illegal exaction. This could allow the claimant to refer to a specific provision of law which, however, only authorizes payment of money by implication, and further down the page we say the right to money may be granted "in terms or by implication," citing authority. This latter gloss cannot be said to be approved in *Testan*. Applying retroactively a *Testan* analysis to the *Eastport* claim, it appears that claim was for pecuniary injury resulting from unexcused delay in issuance of a license. Our opinion points out how common injury of that kind must be, and how remarkable, if it were compensable, there were not court decisions and statutory provisions dealing with the problem. Actually, the claim seems to be for misgovernment, *i. e.*, for misfeasance in the exercise of peculiarly governmental functions, as to which Mr. Lincoln never advocated liability, for it involves issues that could not arise between private litigants. Recently we denied a similar claim on the treble grounds it was for misgovernment, it was barred by the "sovereign act" doctrine, and it was not consented to under the *Eastport* analysis. *City of Manassas Park v. United States*, 224 Ct.Cl. ——, 633 F.2d 181, *cert. denied*, 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980). Thus it appears the *Eastport* decision is no longer a safe guide to the strict construction doctrine unless regard is had to the refinement upon it introduced in *Testan*. And the refinement, obviously, is a new stress on specificity in element (b), that what is required, outside the Tucker Act, is

a statutory statement that, for the breach of right involved, the claimant be authorized to recover "money damages." In *Eastport* the claim being deficient in element (a), substance, the degree of specificity required for element (b) was not addressed except in dictum. In *Testan* the substantive right was conceded and thus element (b) became decisive for application of strict construction. The "substantive right" is no longer enough. I would not deny the possibility of element (b) being satisfied by a strong implication, but I think the implication should be in the mind of Congress, not the court's alone.

Defendant, however, went much too far, implicitly in its briefs, and expressly in oral argument, in demanding almost complete tautology between the Tucker Act and the other legislation examined in strict construction analysis. The Supreme Court assuredly never intended to say that the other legislation, the source of the substantive right, must duplicate the Tucker Act in specifying that a lawsuit is consented to, still less in what tribunal. The best evidence of that is that *Testan* cites with approval, as a properly consented suit, *Selman v. United States*, 204 Ct.Cl. 675, 498 F.2d 1354 (1974), when the other legislation referred to consisted of the provision of 37 U.S.C. § 202(*1*) to the effect that an officer in plaintiff's category is entitled "to the basic pay of a rear admiral (lower half) or brigadier general, as appropriate." This is all the Supreme Court refers to or our opinion below, and the Back Pay Act, 5 U.S.C. § 5596, does not apply to military pay. *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804 (1979). In *Sanders* defendant initially had relied on *Testan* but conceded its jurisdictional constraints were satisfied when plaintiff's claim for judicial promotion was removed from the case. It is, of course, clear that before or after *Testan*, a military pay case in this court must not claim the pay of a position never held. Nonpromotion to or nonselection for a position never held normally is, if wrongful, misgovernment only. *Rawlins v. United States*, 225 Ct.Cl. ——, 646 F.2d 459 (1980) is not contrary to this because it

construes a special jurisdictional act, Private Law No. 95–60. It is time for defendant to cease and desist from urging *Testan* as a bar to military and other pay cases claiming pay for positions actually held. The Supreme Court obviously never intended to withdraw jurisdiction over a class of case where legislation other than the Tucker Act can be said, in *Eastport* terminology, to "mandate compensation" in money. The references in *Testan*, therefore, to "money damages" in connection with rights created outside the Tucker Act does not mean the other legislation must speak in terms of a lawsuit. It is a shorthand way of saying the other legislation must mandate the payment of money in terms readily expressible as money damages in case the mandated duty is not performed.

Where the statute, 25 U.S.C. §§ 406, 407, and regulations, authorize defendant to sell timber from allotted land held by it in trust, receive the proceeds and pay them over to the beneficial owners or dispose of proceeds for owners' benefit, subject to charge for administrative expenses, this in my view mandates the payment of money and, with the Tucker Act, by a *Testan* analysis consents to a suit by an owner for proceeds not paid over to him or properly subtracted for administrative expenses. The amount recoverable on this theory would be limited by *Testan* analysis to the gross amount of proceeds received less proper credits and would not include consequential damages. Defendant in its July 28, 1980, brief at 52 recognizes the clear difference between claims of this character and those in the category of "mismanagement" and will not be astonished by the distinction I draw. I do not agree with defendant, however, that claims as stated above are only in *Eastport* category 1 as illegal exactions. They belong in the other *Eastport* category as the funds were not illegally exacted but were rightly collected. However, I will not be technical: funds of this nature may belong in both categories.

*Mason v. United States*, 198 Ct.Cl. 599, 461 F.2d 1364 (1972), *rev'd*, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973), stands as a

precedent as regards assent to suits to recover for misapplication of trust funds required by law to be paid to Indians or applied for their benefit. The misapplication there was in using trust funds to pay taxes we believed not due. The reversal was on grounds not here involved. *Testan* was still in the future. However, by *Testan* analysis the defendant was substantively a trustee of funds in its hands, and was specifically required to pay them over sooner or later to the Indians, less proper deductions, which, by *Testan* analysis, is with the Tucker Act unequivocal assent to the suit. The defendant did not contest jurisdiction on the grounds that subsequently prevailed in *Testan* and it would appear, properly did not. The statement, however, that the government is liable by implication of the Osage Allotment Act to pay compensation for any breach of trust to the pecuniary disadvantage of a noncompetent Osage allottee (198 Ct.Cl. at 617, 461 F.2d at 1374) is too broad and is contrary to the rule that assent to suit "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969), as construed in *Testan* and *Mitchell.*

Claims by Indian allottees for excessive charges against timber revenues for administration survive *Testan* analysis and there may be others.

In this case we also may have jurisdiction of fifth amendment taking claims where defendant has made use of portions of allotments for roads, or prevented harvesting of some portions to furnish screens for camp sites, etc. The court points out correctly the defenses that may prevail, as that the taking was unauthorized, but this does not affect jurisdiction *per se.*

## III

Plaintiffs refer us to statutes other than the General Allotment Act, *supra,* 25 U.S.C. §§ 406 and 407, *as amended,* which authorize owners to sell timber with consent of the Secretary of the Interior. In effect, defendant sells pursuant to powers of attorney obtained from allottees. The proceeds are paid the owners. Timber is to be sold according to the principle of sustained yield, under regulations the Secretary is to prescribe. Regulations have existed since 1911 and they tell how sales are to be effected in great detail. The Bureau of Indian Affairs (BIA) supervises everything. Plaintiffs say the BIA failed to collect sufficient revenues from loggers, and allowed clear cutting of large, contiguous areas, instead of sustained yield. Clear cutting is somewhat the opposite of sustained yield. The BIA failed to make adequate provision for new growth or to regulate cutting for continuous production, failed to make comprehensive long range plans, failed to locate logging roads to minimize erosion, and failed to provide a sawmill on the reservation so the Indians could receive profits and wages therefrom.

Under 25 U.S.C. §§ 349, 372, defendant was authorized to issue fee patents to Indians whom it found fit to manage their own affairs. But some patents were issued to Indians incompetent to manage their own affairs. Other fee patents were issued without adequate provision to protect access to remaining "landlocked" allotments.

Under 25 U.S.C. §§ 318a and 323-325, defendant was to grant rights of way across trust lands, with consent of the involved Indians and payment of compensation. Defendant failed to obtain fair market value for rights of way, failed to obtain proper consent of Indian landowners, improperly deducted road maintenance costs from "stumpage" payments to Indians, and failed to require restoration of some rights of way to original condition.

Some of the alleged mismanagement under this head may be stated as a taking claim and is covered by comment *supra.*

Under 25 U.S.C. § 162a the Secretary was to invest tribal funds and obtain the best income available. This plaintiffs say was not done.

I concede that plaintiffs have met the first *Testan* requirement. Though apart from the General Allotment Act they have not pointed to any statute that speaks in terms of trusteeships, they have alleged the

existence of legal duties owed to them and breach of such duties by defendant, as a matter of substantive law. It is obvious, however, that such allegations do not meet the second test, because they do not unequivocally allege an obligation to pay money, as a semantically separate and analytically independent proposition. It does not advance us any towards a conclusion that defendant has consented to be sued for money damages for the kinds of malfeasance and misfeasance alleged, to say defendant is a trustee, unless we also allege that the sanctions created by law against an ordinary, e. g., a testamentary trustee, are implied as a matter of law against defendant. But a sanction only implied by law is not "unequivocally expressed." Actually there is kind of a bootstrap quality of reasoning in saying that defendant's duties expressed by law are those of a trustee, and, therefore, we may look at SCOTT ON TRUSTS or the RESTATEMENT OF TRUSTS and impose on defendant all the other consequences the law, as stated by those authorities, derives from the status of an erring nongovernmental trustee. Therefore, my conclusions do not address, and I do not consider, whether defendant is a trustee as to any or all of the legal duties involved, despite the absence of legislation saying so.

Defendant in managing the property of its Indian wards was held to be exercising high governmental powers immune from judicial interference at least as long as it "purported" to act fairly. *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). This we transmuted into a "good faith effort" test in *Three Affiliated Tribes of the Fort Berthold Reservation v. United States,* 182 Ct.Cl. 543, 390 F.2d 686 (1968), but still the test was satisfied though the shrinkage of the Indian property was considerable. That case came under the favorable observation of the Supreme Court in *United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). The *Three Affiliated Tribes* were paid for homestead lands without interest under the sections of the Indian Claims Commission Act, 25 U.S.C. § 70 and ff, which enforce moral claims, which sections do not apply here, as the Supreme Court notes in *Mitchell, supra.* The federal power over Indian lands is so different in nature and origin from that of a private trustee and the necessity of an Indian Claims Commission Act was so well recognized where mismanagement of trust land occurred, that caution is taught in using the mere label of a trust plus a reading of SCOTT ON TRUSTS to impose liability on claims where assent is not unequivocally expressed. And it is certainly at least arguable that mismanagement of Indian lands is really more assimilable to misgovernment, by a *Lone Wolf* analysis, than it is to the misfeasance of a testamentary trustee.

This court so repeatedly cites the recent Supreme Court case of *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), as to give the impression, quite wrongly, that somehow the case supports the court's conclusions. It does, to be sure, consider and describe the scheme we must deal with here, of government control of the harvesting and sale of Indian-owned timber. But the dispute dealt with was entirely different. It was whether the State of Arizona can license and tax a motor carrier engaged wholly in activities on the Reservation using Indian or United States Government-owned roads in logging, or hauling harvested logs. Held, the government regulatory scheme is so pervasive as to shoulder away the state, which performs no pertinent service. Certainly no private trustee could preclude state taxation in this manner and the holding thus appears to be that the federal role is different from that of a private trustee in kind as well as degree. *Lone Wolf v. Hitchcock* and its progeny are not cited or referred to but the opinion seems to be in the same tradition. This pervasive control over Indian life is such a high attribute of the federal sovereignty that ordinary law is precluded or lessened in its impact.

This court has already unanimously held that the trust label cannot be used as a

substitute for unequivocal assent to suit when the alleged breach of trust was committed by Congress itself. *Menominee Tribe of Indians v. United States*, 221 Ct.Cl. 506, 607 F.2d 1335 (1979), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980). When that case was decided, the precedents in this court still stood, that breaches of trust by executive branch officials were assented to *per se* as a subject of money claims. Now that we are required by remand to reexamine them, it is impossible to overlook language in the *Menominee* decision that would have indicated caution in the other cases if it had been decided before them. Certainly the absence of unequivocal assent to be sued, noted in *Menominee*, is a feature *Mitchell* shares as to the mismanagement claims. In our attack on the consent problem in *Menominee*, we proceeded "first of all" to say—

> * * * On the premise issue [consent to suit] now presented, we have nothing at all express in the statutes but only some general and ordinary words which can possibly be stretched to cover the claim, but need not necessarily be so understood. * * * [221 Ct.Cl. at 517, 607 F.2d at 1342.]

This is *Testan* analysis and *Testan* itself is cited for it. The contrast is then drawn with the Indian Claims Commission Act when the consent was so much more wideranging, liberal, and explicit in the words it used. It is not intended to suggest, however, that the other distinctions urged between that case and our *Mitchell* and *Duncan v. United States*, 220 Ct.Cl. 1, 597 F.2d 1337 (1979), *vacated and remanded*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 255 (1980) decisions, then standing as valid precedents, were not valid when made.

Accordingly, I would hold that the mere application of a trust label to certain governmental functions respecting Indians, whether applied expressly by Congress or by judicial wish-fulfillment inference from the statutory imposition of trustee-like duties on the executive branch, does not constitute unequivocal assent to suits against the government for money damages when these duties are badly performed. It does not bring into play all that SCOTT ON TRUSTS thunders against an erring testamentary trustee. Something more is required, such as the expressed duty to pay over money as stated in Part II of this concurrence and dissent.