The **CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON** and **Warm Springs Forest Products Industries, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 00–5002.**

United States Court of Appeals, Federal Circuit.

Decided May 10, 2001.

agement of Indian timber resources. The two plaintiffs are the Confederated Tribes of the Warm Springs Reservation of Oregon and Warm Springs Forest Product Industries, a tribal corporation that engages in timber transactions on behalf of the Confederated Tribes. For convenience, we refer to the plaintiffs collectively as the Tribes. Following a trial on the Tribes' complaint, the Court of Federal Claims found that the government had mismanaged the Tribes' timber resources in several ways. The court, however, held that the Tribes were not entitled to damages on the issues that they have appealed to us. Because the trial court erred in the analysis that led it to conclude that the Tribes are foreclosed from obtaining a monetary recovery based on the acts of mismanagement complained of on appeal, we vacate the judgment and remand the case to the trial court for further proceedings.

## I

### A

Martin E. Hansen, Karnopp, Petersen, Noteboom, Hansen, Arnett & Sayeg, LLP, of Bend, OR, argued for plaintiffs-appellants. On the brief were Dennis C. Karnopp, and Paul D. Dewey. Of counsel on the brief were Charles A. Hobbs, and Marsha K. Schmidt, Hobbs, Straus, Dean & Walker, LLP, of Washington, DC.

Elizabeth Ann Peterson, Attorney, Environment & Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief was John A. Bryson.

Before NEWMAN, SCHALL, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This case involves a claim for damages attributable to the government's misman- The Warm Springs Indian Reservation was created in 1855 by a treaty between the United States and the Tribes of Middle Oregon. In 1972, Congress resolved a longstanding dispute about the boundaries of the Warm Springs reservation by enacting the McQuinn Act, Pub.L. No. 92–427, 86 Stat. 719 (1972), which added an area of forest land known as the McQuinn Strip to the reservation. The McQuinn Act specified that timber within the McQuinn Strip would be managed by the Bureau of Indian Affairs ("BIA") as trustee for the Tribes and that timber harvested from the Strip would be sold at auction but could not be sold for export until after January 1, 1992.

As part of its management responsibilities, the BIA developed a 20–year manage-

ment plan defining maximum anticipated timber harvests for the McQuinn Strip. The plan was designed to implement the BIA's statutory requirement for sustained yield management of timber lands that the BIA managed as trustee. *See* 25 U.S.C. § 466.

By 1989, the total amount of timber harvested from the McQuinn Strip exceeded the amount that was to be harvested under the 20–year management plan. Accordingly, at the Tribes' request the BIA suspended timber harvests on the McQuinn Strip. The suspension had two purposes: to ensure prudent forest management by conforming to the maximum planned harvest, and to save the timber on the McQuinn Strip until the export restrictions ended in 1992. The Tribes and the BIA anticipated that the export price for the timber would be higher than the domestic price—perhaps as much as twice as high—and that postponing the harvest would therefore produce much more income for the Tribes.

During the winter of 1989–1990, windstorms caused severe damage to timber on the McQuinn Strip, blowing down and damaging many trees. Because of the risk that insects and disease would destroy the timber value of the downed and damaged trees, the Tribes and the BIA agreed that the damaged timber should be harvested immediately, despite the general moratorium on McQuinn Strip logging.

In the summer of 1990, the BIA generated a plan to sell the damaged timber, referred to as "blowdown timber." The BIA's plan included harvesting limited amounts of healthy, standing timber, referred to as "green timber," to the extent necessary to provide access to the blowdown timber. The Tribes' Timber Committee approved the proposed plan, which called for the harvest of 18,570,000 board feet of timber. In so doing, the Tribes

reiterated their desire to save as much timber as possible until after 1992.

The BIA issued a sale prospectus for the blowdown timber contract. After the prospectus was issued but before bids were received, the Tribes objected to the amount of green timber that was included in the prospectus. Accordingly, shortly before the sale, the BIA removed 1,500,000 board feet of timber from the designated areas covered by the proposed contract. Vanport Manufacturing, Inc., won the timber contract and began harvesting on August 13, 1990.

The BIA controlled the timber accounting procedures during the harvest. Truckloads of timber were divided into two categories: merchantable loads and cull loads. Payment for the merchantable loads, which contained clearly merchantable logs, was based on the size and type of each log. For the cull loads, which contained nonmerchantable lumber, the Tribes received only a small amount based on the overall weight of the removed material. The logging company representatives designated a load as either cull or merchantable lumber as the logs were loaded onto each truck.

Two methods were used to measure the amount of timber on each load. Merchantable loads were "rollout" scaled. In rollout-scaling the logs are taken off the truck and counted individually based on length, circumference, and type of tree. Cull loads were "scan" scaled. In scan-scaling the material remains on the truck, and the scaler walks around the truck to determine that no merchantable logs are present. Additionally, the Tribes identified records of 12 loads, designated as cull, for which rollout-scaling was performed after an initial scan-scaling. For each load (cull or merchantable) the scaler generated a truck ticket detailing the results of that scale. The sum of all the truck tickets formed the

accounting records that provided the basis for payment to the Tribes.

To verify the accuracy of the initial scaling, the BIA used "check-scaling." In check-scaling, a certain percentage of the loads are diverted to third-party scalers who perform independent rollout-scalings. These independent scalings are compared to the corresponding truck tickets to detect any systemic mistakes occurring in the initial scalings. In 1990, BIA guidelines suggested check-scaling five percent of the loads, although a BIA expert testified that the five percent guideline had not been used since the 1970's. In the blow-down sale in this case, check-scaling was actually performed on less than one percent of the merchantable loads.

## B

Following the sale, the Tribes filed suit in the Court of Federal Claims, contending that the BIA had mismanaged the sale in a manner that substantially reduced the Tribes' income from the harvested timber. The mismanagement, the Tribes contended, constituted a breach of the BIA's fiduciary obligations and entitled the Tribes to recover damages from the government for the diminution in value of the proceeds from the timber harvest.

The Tribes presented several theories of fiduciary breach by the BIA, three of which they continue to press on appeal. First, they asserted that too much green timber was included in the sale. According to the Tribes, that timber should have been preserved for harvest and sale after 1992, when it could have been sold in the export market for a much higher price. Second, they complained that as a result of serious errors in the BIA's accounting procedures, the reported amounts of timber harvested substantially undercounted the actual amount harvested from the designated areas. Third, they asserted that trees were taken from areas that were not designated in the timber contract, which constituted timber trespass as defined in the timber contract and relevant Oregon statutes.

At trial, the Tribes offered "stump cruise" data to show a disparity between the amount of timber taken and the amount for which they were paid. In a stump cruise, researchers count the number, size, and type of stumps in a subsection of a harvest area. Based on that sample, an estimate is made of the total amount of timber taken from the entire harvest area. The Tribes' stump cruise resulted in an estimate of the amount of harvested timber that was substantially higher than the amount reflected in the BIA records of the harvest. The BIA performed its own stump cruises, which resulted in estimates of the amounts of harvested timber that closely matched the BIA's harvest records.

After the trial, the court issued an opinion in which it agreed with the Tribes that the BIA had mismanaged the timber sale in several respects. First, the court found that the BIA erred by permitting the harvest of healthy as well as damaged trees. In doing so, the court found, the BIA did not take into account the fact that the annual allowable harvest for the McQuinn Strip had already been exceeded and that Tribes' goal was to save as much timber as possible until after 1992, when it could be sold in the export market. The court noted that BIA officials admitted that including green timber in the harvest was "a poor decision," and that although instructions to remove green trees from the sale were passed down to BIA employees, green timber that had been marked improperly was still harvested. While the court noted that some green timber had to be removed to ensure safety and to gain access to damaged timber, the court found that those instances were "relatively few."

The BIA acted "imprudently," the court concluded, when it did not remove , the majority of the green timber from the salvage sale.

Notwithstanding its finding that the BIA breached its fiduciary duty to the Tribes by improperly including green timber in the blowdown sale, the court held that the Tribes were not entitled to damages for that breach. The court explained that the Tribes had suffered no compensable loss because the Tribes had received the full domestic price for the green trees that were improperly cut. The court added that it could "only speculate on what prices in the export market might have been at some hypothetical time" after January 1, 1992, when the trees could have been sold for export, and that "we have no way of knowing whether they would have cut the timber in 1993 or at some later date."

With respect to the Tribes' contention that the amount of timber removed during the harvest was substantially undercounted, the court disagreed. As to that issue, the court ruled that the Tribes bore the burden of showing that they did not receive the full benefit of the timber harvested and that although they "raised some issues and inconsistencies with regard to [the BIA's] management and the procedures it used to account for the Tribes' timber," they "did not prove that a substantial amount of timber was missing."

With respect to the Tribes' timber trespass claim, i.e., the argument that the BIA improperly allowed the contracting logging company to cut trees that were not properly designated as part of the sale, the court understood the Tribes' claim to rest on an Oregon statute that required proof of willful misconduct on the part of the government. Because the court found that the government's conduct with respect to the timber trespass claim was not willful, the court denied the Tribes any recovery on that claim.

On appeal, the Tribes renew each of the three claims discussed above. Other claims disposed of by the court have not been appealed. The government has not challenged the court's finding that the BIA breached its fiduciary duty to the Tribes by permitting green timber to be cut during the blowdown sale, but it argues that notwithstanding the breach of fiduciary duty, the Tribes have not established a basis for an award of damages.

II

■ Pursuant to statute and regulation, the United States exercises comprehensive control over the management and harvesting of timber on Indian reservations. As a result, the United States has a fiduciary responsibility to manage those timber resources "based upon a consideration of the needs and best interests of the Indian owner and his heirs," 25 U.S.C. § 406(a), and the proceeds from the sale of timber harvested from the reservations must be used for the benefit of the Indians or transferred to them, *see id.* §§ 406, 407. The Secretary of the Interior is directed to adhere to principles of sustained-yield forestry on all Indian forest lands under government supervision, *see United States v. Mitchell,* 463 U.S. 206, 209, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), and to manage the forested reservation land so as to ensure that the Indians receive "the benefit of whatever profit [the forest] is capable of yielding," *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 149, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Tribes that own timber managed by the federal government enjoy the right of an injured beneficiary to seek damages for alleged breaches of the fiduciary obligations that are defined by the statutes and regulations that give the federal government the responsibility to manage Indian timber resources for the Indians' benefit. *See Mitchell,* 463 U.S. at 226, 103 S.Ct. 2961.

■ Under trust law generally, a beneficiary is entitled to recover damages for the improper management of the trust's investment assets. In determining the amount of damages for a breach of the trustee's fiduciary duty with regard to investments of the trust property, courts attempt to place the beneficiary in the position in which it would have been absent a breach. *See Roth v. Sawyer–Cleator Lumber Co.*, 61 F.3d 599, 604 (8th Cir.1995); *Donovan v. Bierwirth*, 754 F.2d 1049, 1058 (2d Cir.1985); William F. Fratcher, *Scott on Trusts*, § 208.3 (4th ed.1987); George Gleason Bogert, *The Law of Trusts and Trustees* §§ 701–06, 861 (1982). With respect to the government's management of Indian timber resources, tribes whose timber resources are mismanaged are entitled to "any fall-off from the income they would have received from their forests and lands" resulting from the breach. *See Mitchell v. United States*, 229 Ct.Cl. 1, 664 F.2d 265, 271 (1981), *aff'd*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). In the case of a breach consisting of a sale of timber assets for less than their full value, the tribes are entitled to recover "the difference between the actual proceeds and the greatest appropriate revenue which should have been obtained." *Id.*

Although the trial court held that the United States breached its fiduciary duty by selling the green timber prematurely, the court denied the Tribes any recovery for that breach on two grounds: (1) the Tribes "received full value for the green trees cut improperly," i.e., the Tribes received the full domestic price for those trees; and (2) the court could "only speculate on what prices in the export market might have been at some hypothetical time" in the future.

■■ Neither of those grounds justifies refusing to award any damages for the improperly harvested green timber. To deny recovery on the ground that the Tribes recovered the full value of the trees in the unfavorable market in which they were sold ignores the nature of the breach, which consisted of harvesting and selling the trees on the domestic market rather than waiting to harvest and sell them for export. It also disregards the legal principle, recognized by the Court of Claims in the *Mitchell* case, that Indian tribes in a case of improper sales of timber assets are entitled to recover "the proceeds of the sales which should have been made under proper management—not merely the actual proceeds of actual sales." *Mitchell*, 664 F.2d at 271.

■■ The court was also wrong to refuse to award damages on the ground that any award would be speculative. It is a principle of long standing in trust law that once the beneficiary has shown a breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee. The Second Circuit applied that principle in setting forth the proper damages analysis in *Donovan v. Bierwirth*, 754 F.2d at 1056:

> Where several alternative investment strategies would have been equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of providing that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.

*See also N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 182 (2d Cir.1994) ("once the plaintiffs established the trustees' breach of their duty of loyalty, the trustees bore the burden of proving any 'set off' to the extent of their liability"); *Wootton Land & Fuel Co. v. Ownbey*, 265 F. 91, 99 (8th Cir.1920) (burden of proof in an ac-

counting is on the fiduciary to prove the amount of any credit). That principle stems from the English case of *Armory v. Delamirie*, 93 Eng. Rep. 664 (1722), the "Chimney Sweep's Jewel Case," in which the plaintiff chimney sweep bailed a jewel with the defendant jeweler. When the jeweler failed to return the jewel, the court ruled that unless the defendant "produce the jewel, and shew it not to be of the finest water, [the jury] should presume the strongest against him, and make the value of the best jewels the measure of [the plaintiff's] damages."

In light of the trial court's findings that the BIA's failure to prevent the logging of substantial amounts of green timber constituted a breach of the BIA's fiduciary duty to the Tribes and that the Tribes and the BIA had agreed to postpone the harvesting of the green timber until after January 1, 1992, when that timber could be sold at higher prices on the export market, there is no question that the Tribes have established both a breach and some loss. The only question is whether the proof of loss was too speculative to support any recovery at all, as the trial court held. Under the foregoing principles of trust law, the Tribes should not have borne the risk of uncertainty as to precisely how much the green timber would have sold for if it had not been prematurely harvested. That is particularly true on the facts of this case, where resolving the issue of damages does not require unguided speculation.

The Tribes introduced evidence that, even before the blowdown sale, they intended to sell a substantial amount of timber during 1992 and 1993. They also offered evidence as to the export prices for green timber during those years. To be sure, there are unresolved factual issues that must be addressed, such as (1) how much green timber was improperly sold; (2) how much of that timber the Tribes would have sold during 1992 and 1993, and (3) when, during those years, the Tribes would have sold the timber (the prices varied during the 1992–93 period). Those factual issues, however, are amenable to resolution within a reasonable degree of approximation, which is sufficient to support an award. *See Ace–Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed.Cir.2000) (quoting *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)) ("If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery."); *Elec. & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1968) ("where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision").

The government asserts that the Tribes could not have sold the green timber in 1992 because the Tribes sold other timber assets during that year. The government acknowledges, however, that there were no statutory or regulatory limits on the amount of timber that the Tribes could have harvested in 1992. The government's argument is therefore that any additional timber the Tribes sold in 1992 would have depressed the market price and thus reduced the proceeds from the 1992 sales. The trial court, however, made no finding on that issue. We decline to affirm the ruling on the green timber issue based on the government's unsupported suggestion that selling additional timber from the Warm Springs reservation in 1992 and 1993 would have depressed the prices on the export market sufficiently to deprive the Tribes of any economic advantage they would have enjoyed from postponing the harvesting of the green timber that was improperly taken in the blowdown sale. The question of the effect, if any, that the Tribes' timber sale would have had on prices in the export market is a factual

question to be addressed on remand when the trial court seeks to determine the proper damages for the breach of fiduciary duty.

The government also argues that the "fatal flaw" in the Tribes' case at trial was their failure to establish the volume of timber that reasonably could have been left standing and was instead logged in the blowdown sale. The trial court, however, did not base its decision on any alleged inadequacy in the Tribes' proof as to the amount of improperly harvested timber. On that issue as well, we decline the government's invitation to affirm the judgment of the trial court on a ground not adopted by that court.

██ On remand, the trial court must determine, as best it can under the circumstances, how much green timber was improperly taken, when that green timber would have been sold, and for what price. That sum must then be compared with the amount received for the improperly harvested green timber in the blowdown sale. Only in that manner will the Tribes receive the "difference between the actual proceeds and the greatest appropriate revenue which should have been obtained," *Mitchell,* 664 F.2d at 271, which is the measure of damages applicable here.

### III

Apart from the improper harvest of green timber, the Tribes contend that they were not paid for a large amount of the damaged timber that was harvested during the blowdown sale. That aspect of the Tribes' claim refers to timber that the Tribes assert was properly removed under the contract but not counted in the BIA records on which the payment to the Tribes was based.

The Court of Federal Claims found that the Tribes had "raised some issues and inconsistencies with regard to defendant's management and the procedures it used to account for the Tribes' timber," but it declined to award the Tribes any damages for the accounting irregularities because the court found that the Tribes "did not prove a substantial amount of timber was missing" and because the court concluded that it was unlikely that significant numbers of logs would have been removed from the site undetected. The court therefore concluded that there was insufficient evidence "that logs were lost or stolen as a result of the BIA's handling of the 1990 blowdown sale."

██ To the extent the court considered that the Tribes were required to prove that "a substantial amount of timber was missing" before they could be awarded damages, the court was mistaken. There is no threshold minimum of loss that the Tribes were required to prove before being entitled to an award. Even if the damages are minimal, the Tribes are entitled to recover whatever damages they can prove.

 The Tribes also contend that they should not bear the burden of proving losses that cannot be established with certainty because of the BIA's failure to keep adequate records of the timber that was removed during the blowdown sale. Under trust law principles, if a trustee fails to keep proper accounts, "all doubts will be resolved against him and not in his favor." William F. Fratcher, *Scott on Trusts,* § 172 (4th ed.1987); *see also Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946) ("[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."). More generally, as the Second Circuit stated in *Donovan v. Bierwirth,* 754 F.2d at 1058 (quoting *Nedd v. United Mine Workers,* 556 F.2d 190, 210 (3d Cir.1977)), "once the beneficiaries have established their

*prima facie* case by demonstrating the trustees' breach of fiduciary duty, 'the burden of explanation or justification ... shifts to the fiduciaries.' "

■■■ The BIA had complete control over the accounts and accounting procedures used in the blowdown sale, and the Tribes introduced evidence that the accounting procedures followed by the BIA during the sale were seriously flawed. For example, although BIA policy required check-scaling five percent of all loads, in the 1990 sale the BIA check-scaled less than one percent of the loads— a rate described by the BIA's own expert as "totally unacceptable." In addition to that evidence regarding the overall problems with the BIA's accounting procedures, the Tribes introduced specific evidence with respect to three particular items that was sufficient to establish a *prima facie* case of loss. With respect to those three items, the Tribes' evidence was strong enough to call for a specific response from the government and specific findings by the trial court, rather than a general conclusion that it was unlikely that a significant number of logs would have been removed from the harvest area undetected.

First, the Tribes identified stumps corresponding to 273 noble fir logs that were not identified on any of the truck log tickets. The trial court did not address the Tribes' evidence on that aspect of their claim, and the government in its brief in this court has not directed our attention to evidence indicating that the Tribes' claim is unfounded. On remand, the trial court should specifically address the evidence pertaining to those logs, determine whether they were taken and, if so, whether the Tribes were paid for them.

Second, the Tribes complained that they received no payment for merchantable timber found on up to 125 truck loads that were removed during the blowdown sale.

The BIA wrote a letter to the logging contractor requesting payment for 121 of those loads, but during oral argument of this appeal the government was unable to point to any evidence providing satisfactory assurance that the Tribes were paid for those loads. The court on remand should determine the status of the claim for payment for those loads.

Third, the Tribes introduced evidence that, of the nearly 900 cull loads removed during the harvest, 12 were scaled using both scan-scaling and rollout-scaling. On eight of the 12 dual-scaled loads, according to the Tribes' evidence, significant amounts of merchantable timber were detected for which the Tribes were not paid. While 12 loads is a relatively small sample, the size of the sample was the result of BIA's sampling procedure. Again, the government has not directed us to evidence indicating that the Tribes' evidence regarding the 12 dual-scaled loads is unreliable, and the Tribes' evidence is sufficient to call for a specific response from the government and specific findings by the trial court. On remand, the court must determine whether the 12 dual-scaled loads are a reliable indicator of a systemic undervaluation of the cull loads and whether it is reasonable to assume that they were representative of all the cull loads taken out during the harvest. In any event, if the court determines that the rollout scale accurately determined the amount of lumber in the 12 dual-scaled loads and that the Tribes were not paid in accordance with that determination, the court must at least award the Tribes damages for those loads.

In addition to the evidence regarding the 12 dual-scaled loads, the Tribes introduced evidence that the average gross volume of timber on each of the cull loads was approximately 8000 board feet per load, but that the Tribes were paid for only 5000

board feet per cull load. A BIA expert conceded that the amount of cull was underestimated by at least 1270 board feet per load. In light of that evidence, the court on remand must determine whether there was an underpayment for the cull loads and, if so, how much the Tribes are entitled to recover on that account.

We recognize the difficulties involved in trying to reconstruct the events that occurred during the harvest 11 years ago when the records are incomplete and may be unreliable in some respects. In particular, we recognize the problems presented by relying on stump cruises to determine the amount of timber harvested from the reservation during the blowdown sale. However, to the extent that the difficulty in determining the amount of loss suffered by the Tribes is attributable to improper accounting procedures followed by the BIA, the consequences of those difficulties should not be visited upon the Tribes. And we are satisfied that, notwithstanding the difficulties of proof, the Tribes have offered sufficient evidence on the three items identified above to require specific response from the government and specific findings by the court as to each item.

## IV

The Tribes' final contention relates to its claim of timber trespass. The applicable regulation provides that in the event of timber trespass, damages will be awarded in accordance with the law of the state in which the trespass is committed, see 25 C.F.R. § 163.22(c), and the Bureau of Indian Affairs *Manual for Forestry* provides that it is the BIA's policy "to insure that unauthorized timber losses are expeditiously investigated, reported, payment demanded, and just compensation made to the Indian owners." 53 BIAM § 7.1. The Tribes sought damages from the United States on the ground that the BIA had not complied with its duty to obtain compensation for timber trespass pursuant to the regulation and the contract (which provided for double damages for losses due to timber trespass).

The Court of Federal Claims understood the Tribes' argument for damages against the United States to be based on an Oregon statute that permitted treble damages in the event of willful misconduct. The court therefore construed the Tribes' claim to require proof of willful misconduct by the United States, see Or.Rev.Stat. § 105.810. Based on that understanding, the court dismissed the timber trespass claim on the ground that willful misconduct had not been shown. In fact, the Tribes did not seek recovery under the treble damages statute, but instead sought double damages under the contract and the Oregon statute applicable to unintentional trespass, Or.Rev.Stat. § 105.815. The Tribes are therefore entitled to have the court reconsider their timber trespass claim.

On remand, the court should determine whether the BIA breached its duty to prevent timber trespass and, if so, how much timber was taken that was not designated for harvest under the logging contract. For that timber, the Tribes should receive double damages, which is the measure specified in the Oregon unintentional timber trespass statute.

## V

To summarize, we vacate the judgment of the Court of Federal Claims and remand for determination of damages. The Court of Federal Claims should determine the following items in a manner consistent with this opinion: (1) the amount that the Tribes would have earned from the sale of the green timber that was improperly included in the blowdown sale; (2) the amount of timber, if any, that was harvested under the logging contract but is missing from the BIA records and did not

result in payment to the Tribes; and (3) the amount of timber that was harvested in trespass, if any, and whether the BIA breached its duty to the Tribes by failing to prevent that trespass. Damages should be awarded to the Tribes based on these determinations.

*VACATED and REMANDED.*